NEWCOMB v. OGDEN CITY PUBLIC SCHOOL
TEACHERS' RETIREMENT COMMISSION et al.

No. 7352.   Decided May 12, 1950.   (218 P. 2d 287.)

See 16 C. J. S., Constitutional Law, sec. 95. Teachers pensions, determining right to, see note, 2 A. L. R. 2d 1023. See, also, 40 Am. Jur. 973.

*Samuel C. Powell,* Ogden, *Derrah V. Van Dyke,* Ogden, for plaintiff.

*Wade M. Johnson,* Ogden, for defendants.

LATIMER, Justice.

This is an original proceeding instituted in this court to prohibit the Ogden City Public School Teachers' Retirement Commission and the individual members from terminating or dissolving the association. A temporary writ of prohibition was issued and the plaintiff seeks to have the same made permament. Because the Board of Education has not been made a party and its obligations cannot be determined and because the relative rights of pensioners, annuitants, and claimants are not prescribed by statute and cannot be adjudicated in this court we are unable to resolve the many conflicting principles. We, therefore, quash the alternative writ of prohibition without prejudice to the rights of the parties to further pursue their remedies if they elect to bring in the Board of Education. In the hope that our views may be of assistance in ultimately disposing of this litigation, we suggest some of the factors which we consider may influence the ultimate determination of the constitutionality of the act.

The petitioner is a widow of the age of seventy years who resides in Ogden, Weber County, State of Utah. Prior to June 15, 1938, she was a member in good standing in the Ogden City Public School Teachers' Retirement Association, having complied with all of its rules and regulations since she became a member. She was retired on the above mentioned date for reasons of age and service and for the purpose of this suit she was paid her annuities from the time of her retirement until this action was commenced. In 1949, the legislature of this state passed an act permitting the termination of a teachers' retirement association by a majority vote of the members. This act provided that, if dis-

solved, the funds and assets of the association were to be distributed to members, annuitants and claimants in such manner and order as the commission or the district court should determine. In pursuance of this act the teachers belonging to the defendant retirement association held an election and voted to discontinue the association. Petitioner, who ceased to be a member because of her retirement, represents herself and other retired members in this attempt to prohibit further efforts to dissolve.

The principal contention advanced by the petitioner is that Chapter 91, Laws of Utah, 1949, which authorizes the dissolution of teachers' retirement associations, is unconstitutional. This act seems to follow a pattern usually found in acts dealing with voluntary associations and because we believe the legislature may have misconceived the nature of this association we show, by legislative history, the evolution of the association from one of a voluntary nature to one of compulsion. We do this because what the legislature may constitutionally prescribe to effect the rights of a member of a voluntary association may be entirely different from what may be prescribed when dealing with a member of an involuntary organization whose rights are fixed by statute.

The original Teachers' Retirement Act for Public School Teachers was enacted by the legislature in 1907. Laws 1907, c. 111. This act permitted cities of the first and second class and counties, when requested by a majority of the teachers of those school districts, to organize public school teachers' retirement commissions. This act did not make membership in the association compulsory as the school teachers had the right either to accept or decline membership. Once membership was declined a teacher could only become a member by permission of two-thirds of the members of the commission and payment of all back dues. The whole structure was founded on the voluntary participation by teachers who chose to become members.

In this act there were three sources of income. The first source was a payroll deduction of one per cent of the salary paid to each member of the association; the second source was deductions from teachers' salaries for absences of not to exceed five days in any one year for each teacher member; the third source was monies received from donations, legacies, gifts, bequests or otherwise. The act provided that the funds paid into the association should become part of either a current fund or a permanent fund. The money received from the first two sources was to constitute the current fund and the money received from donations, legacies and gifts was to constitute the permanent fund. No portion of the permanent fund was to be available for current expenditures but the interest earned by the money in the permanent fund was to be made available for such purposes.

In view of the nature of the plan, it must have been contemplated by the legislature at that time that the venture might not be self-sustaining and that the funds received by the association might not be sufficient to pay all annuitants and claimants as Section 1966x16, Compiled Laws of Utah of 1907, provided:

"Insufficient funds. If at any time the funds of the Retirement Association are not sufficient to meet the annuities and refunds hereinbefore specified, each annuitant and claimant shall be paid pro rata his or her proportion of the funds that are available."

Undoubtedly, at that time, the rights of the members to a fixed or definite pension was doubtful. Likewise it is doubtful that any contractual or statutory obligations were imposed on the Boards of Education.

In 1917 the act was amended so that membership in the association no longer was on a voluntary basis. Thereafter every teacher who accepted employment with a school board of cities of the first or second class became a member of a

retirement association by virtue of his or her employment. Chapter 70, Section 9, Laws of Utah, 1917, provided:

"Every teacher who, after the taking effect of this Act, accepts employment under the board of education of a city of the first or second class in which city a teachers' retirement association has theretofore been organized, shall, by virtue of such employment, become a member of such retirement association, *and there shall be incorporated in the contract of employment a stipulation that the teacher agrees to and is bound by all the rules and provisions governing membership in such association.*" (Italics added.)

In another change made that year, the legislature added to the sources of the permanent fund by providing that any part of the current fund which was not used during the school year for the payment of annuities or refunds should be transferred to and become a part of the permanent fund.

In 1921 the legislature amended the act so as to require boards of education to make payments of matching funds. Chapter 109, Laws of Utah, 1921, was enacted as follows:

"The income of the public school teachers' retirement association shall be from the following sources:

"1. *All teachers who are members of a teachers' retirement association in cities of the first and the second class shall have deducted from each and every pay roll in payment for services, 1 per cent of the face of said pay roll,* and the amount of such deduction shall be certified to and paid by the clerk of the board of education monthly to the treasurer of the association; provided that an annual salary of $1200 shall be the maximum salary on which dues shall be paid, and if any teacher shall receive a salary in excess of such sum, then the deduction shall be made on $1200 only;

"2. *The board of education shall pay an amount equal to the total amount paid to the public school teachers' retirement association fund by or on behalf of all teachers during each year* under the provisions of subdivision 1 of this section, such amount to be certified to semi-annually by the clerk of the board of education and by him paid semi-annually to the treasurer of the association;

"3. All moneys received from donations, legacies, bequests, or otherwise, for or on account of said fund." (Italics added.)

This amendment in addition to requiring the boards of education to pay into the retirement funds amounts equal to the amounts deducted from the teachers' pay made different provisions with respect to sources of income. As amended, the section was changed so that the two sources of income which previously constituted the current fund and which had been deductions from the teachers' pay and deductions for absences then became deductions from the teachers' pay and contributions made by the board of education. From that time on, both parties to the contract of employment, viz., Board of Education and teacher member, were required by statute to furnish the current funds with which to operate the association. Other payments to the current fund would not sustain the association so that deductions and matching funds were the only substantial source of income to secure vested rights of pensioners and annuitants.

In 1935 the legislature provided for a method by which the contribution of members and the matching funds of the board of education could be adjusted to meet any fluctuating demands on the finances of the association. Section 75-29-9, Revised Statutes of Utah, 1933, was amended and the important provision is the following, (Chapter 61, Laws of Utah, 1935:)

"The retirement commission may increase or decrease the rate of salary deductions and the limitations provided in this section, *if the proposed modifications have previously been approved by the board of education, and by two-thirds of the ballots cast by the members of the retirement association,* at an election, called by the retirement commission, and held, after notice thereof posted in each school building and at the administrative office, at least ten days prior to the day on which said election is held." (Italics added.)

Apparently this latter amendment did not cure the financial ills of the city retirement association, as in 1945 the legislature amended subsection 2 of the above quoted section by permitting the Board of Education to appropriate

additional funds. This subsection as amended reads (Chapter 94, Laws of Utah 1945):

"The board of education shall pay an amount equal to the total amount paid to the public school teachers' retirement association fund by or on behalf of all teachers during each year under the provisions of subdivision (1) of this section; *provided, however,* that if the rate of contributions of teachers has reached two per cent of the salary, as limited by the provisions of subdivision (1) hereof, the board of education may appropriate to the current fund of the association such additional amount, not exceeding two per cent of the salaries of teachers for the year in which the appropriation is made, as may be required to meet any deficit occurring in that fund. The amount so payable by the board of education shall be paid over to the treasurer of the association in semi-annual installments."

Even though these legislature changes may have indicated that the plan was actuarily unsound each change sought to improve its financial stability. As a result, Mrs. Newcomb could reasonably anticipate substantial incoming current funds to secure her pension payments so long as the association continued in existence.

The amendments quoted and discussed are not all of the modifications made by the legislature during the years, but those referred to chart the course of the legislature in changing the rights, interests and obligations of the Boards of Education and members in a city school teachers retirement association and show how the plan originally conceived as voluntary, gradually evolved into one of compulsion. It will be noted that up until the year 1917 membership in the association was voluntary and any anticipated benefits were conditioned on contribution by volunteers. The legislature took into account the voluntary nature of the plan and expressly provided that if the funds contributed were not sufficient to meet all demands the available funds should be prorated between the members according to their respective rights. Even though this provision survived when the law made participation compulsory and may control the rights of retired members to participate in the funds held by the association, it does not dispose of the

ultimate liability of the Board of Education, a difficult question which we cannot answer at this time as the Board did not consent to a dissolution of the association and is not a party to these proceedings, but a question which must be ultimately decided.

While many changes were made by the legislature which influenced the rights of the petitioner, the Association and the Board of Education, she was retired in 1938 and her rights must be determined and the contract provisions established by statutes in effect as of that time ■ as that is the time when her interest became vested and the Association's and the Board's obligations, if any, arose. Section 75-29-10 U. C. A. 1943, which we have referred to in the earlier acts and discussed generally, was in effect in 1938. It deals with the permanent and current funds and provides as follows:

*"The first two sources of income defined in the next preceding section* (teachers contributions and the Board of Education's matching funds) *shall constitute the current fund,* and the third source shall constitute the permanent fund, unless specifically stipulated for the current fund in the donation, legacy, gift or bequest. *No portion of the permanent fund shall be available for current expenditure,* but the interest thereon shall become a part of the current fund. *Any part of the current fund which is not used during the school year for the payment of annuities* shall be transferred to and become a part of the permanent fund." (Italics added.)

Section 75-29-15, U. C. A. 1943, likewise discussed as being included in earlier acts, deals with distribution in the event funds are insufficient and provides as follows:

"If at any time the funds of the retirement association are not sufficient to meet the annuities and refunds hereinbefore specified, each annuitant and claimant shall be *paid his or her pro rata share of the funds that are available."* (Italics added.)

In interpreting these sections together, we shall assume that the legislature intended the rationing of funds, if insufficient, to be limited to current funds, as at that time

permanent funds were untouchable by annuitants and claimants.

With these sections in force and effect, Chapter 91, Laws of Utah, 1949, was enacted. This chapter provides as follows:

"Upon the written request of at least ten per cent of the members of a public school teachers' retirement association the retirement commission shall or upon its own motion the retirement commission may cause an election to be held by the members of the association for the purpose of determining whether or not the association and its retirement system be terminated. The retirement commission shall cause each member of the association to be notified in writing by mailing to his last known address at least ten days prior to the election of the time, place and purpose of such election.

"If a majority of the ballots cast by the members at such election favor termination of the association, such association shall be terminated upon the effective date prescribed by the members in such election.

"Immediately after such termination of the association, the retirement commission shall distribute all of the remaining funds and assets of the association to its members and/or annuitants and/or claimants in such manner and order as to the commission shall seem proper or shall petition the district court of the county within which the association is located for an order dissolving the association and distributing its funds and assets to such members and/or annuitants and/or claimants."

In the case of *Gubler et al.* v. *Utah State Teachers' Retirement Board*, 113 Utah 188, 192 P. 2d 580, 586, 2 A. L. R. 2d 1022, we announced the following rule:

"The principles which sustain the original act are that the retirement benefits are an inducement to experienced teachers to join and remain with the state school system, and are in effect *payment for services performed* between the date of the act and the date of retirement." (Italics added.)

In view of the holding in that case and the provisions of Chapter 109, Laws of Utah, 1921, previously quoted, it must be conceded by the defendants that a contract of em-

ployment was entered into by and between the Board of Education of Ogden City and Mrs. Newcomb. ■ Part of this contract was that Mrs. Newcomb should receive an annuity or pension upon retirement in an amount to be determined by the statutory provisions in effect at the time of her retirement. We need not decide at this time whether this contract of employment required the payment of a full $600 a year annuity or pension or whether Mrs. Newcomb was only entitled to a lesser payment depending upon the amount of the current funds. Neither need we definitely decide whether the legislature was dealing with current funds of a going concern when it prescribed for a prorata share, if the funds were insufficient, or whether it contemplated such a distribution of all funds if the association became insolvent. Section 75-29-15, U. C. A. 1943, seems to limit pensioners or annuitants to their prorata share of current funds but it is well to remember that this provision is a carryover from the early enactments creating volunteer organizations and the legislature may have intended that the provisions apply with equal force if the association became bankrupt. However, it is difficult to chisel out from that section a legislative intent to permit teacher members to wreck the association and destroy the vested rights of retired members by drying up the source of the funds.

In following down through the legislative history of these associations we discover that since the 1935 amendment the teacher members, the Association, and the Board of Education of the particular school district have been made necessary parties when the legislature has authorized the association to amend or alter its rules and regulations with regard to contributions or matching funds. The arrangement has been a three party agreement and in order to change the amount of income from contributions and matching funds the members, the Association, and the Board of Education were required to act concertedly. Yet the 1949 act ignores the Board of Education and the Association and

permits a destruction of the permanent fund and a drying up of the source of the current fund by a majority vote of the teachers. The vote of a majority of the teacher members possibly forces a tremendous financial burden upon the Board of Education, dissolves the Association, and may seriously decrease Mrs. Newcomb's pension payment without any of the three latter parties being able to avoid or avert the legal effect of the vote. We are thus confronted with a situation where the legislature has delegated to the membership of an association the right to amend, change and modify a contractual relationship existing between three other parties without rights on their part to insist on a continuation of the relationship. Stated a little differently, the contract of employment is between the Board of Education and Mrs. Newcomb and this contract is in a sense secured by the current funds being paid to the third party. Mrs. Newcomb's right under the contract entitles her to receive a pension or an annuity in some amount and the obligation of the Board of Education is to insure that the amount due is paid, at least to the extent of the available current funds. Section 75-29-9, U. C. A. 1943, as amended, permits the Board of Education to assent to an increase or decrease in the amount of deductions and matching funds and if any adjustments are made in good faith it may be assumed no liability is fixed, but nothing is said in that or any other statute as to the liability of the Board of Education if the payments are entirely stopped or reduced to practically nothing. Some members of the court lean to the belief that the Board of Education is liable for payment to Mrs. Newcomb in the latter events. Others are of a contrary opinion. This difference in opinion, at least, points out that if the 1949 act is constitutional two alternative propositions are presented, either the Board of Education's liabilities will be increased, or Mrs. Newcomb's rights prejudicially diminished. The question posed by this proceeding, therefore, expands beyond whether or not the legislature can pass an act imposing additional obligations on Boards of Education or reducing the pensions of annui-

tants. The question reaches to whether we can test the constitutionality of an act by adjudging relative rights between parties when one is not before us.

We have no doubt that the legislature can saddle upon the Board of Education any reasonable obligation, including the necessity of paying retired teachers their pensions, but the intent to do so must be expressed or clearly implied. The structure and sense of the 1949 act hardly prompts the belief that the legislature intended to convert the liability to the retired school teachers from the Association to the Board of Education. This is, however, one of the consequences which may flow from the enactment, if valid, as Mrs. Newcomb and others in her class have vested rights which must be considered. We have the duty to uphold the constitutionality of the act if reasonably possible and the liability of the Board of Education may be the determining factor in whether there has been an impairment of Mrs. Newcomb's contract. A suit in which all parties are joined is necessary to a final disposition of this question.

The distribution of the permanent funds, if the association is dissolved, presents another hurdle which bars the final determination of the present issues. The statute makes no provision for priorities of payment and we must assume, although we cannot decide, that distribution will be made first to those with fixed rights. We have previously held that retired members have vested interests while those who have not qualified have only inchoate interests. The former class would, under our previously decided cases, have a paramount interest in the fund and those who have not yet retired might be entirely cut off from any payments from the fund or pension from the Board of Education. Such a result would work a definite handicap on members who are near retirement age and yet it might be that such a distribution would render the act constitutional. If retired members received payment of all of the funds in the association there might not be an impairment of their con-

tract as this might be the extent of their rights. By suggesting this possibility we do not wish to be understood as so ruling as this again involves the liability of the Board of Education. We merely mention it to illustrate the difficulties to be encountered if, and when, a plan is conceived for distribution.

We realize that if the funds must be held to secure the rights of retired members and distributed to them over the remaining years of their lives, there is no possibility of immediately winding up the affairs of the association. Even a fair estimate of the present amount of a lump sum settlement is hardly possible as there is one influential factor which is unascertainable, namely, the number of years each retired member will live. In addition there is one indefinite factor which must be determined and that is the monthly amount each retired member is entitled to receive. The latter amount is problematical but might be made mathematically certain if the amounts due pensioners is determined by assuming the amount each received in the future will be the same as the amount being paid at the time of terminating the Association.

If any of the assets of the association can be used to repay teacher members their contributions, and, if it be assumed the Board of Education is liable to the retired members for their pension payments, then the amount of additional liability imposed on the Board might be excessive. Under this theory the dissipation of funds for purposes other than pensions would immediately increase the Board of Education's liability from that of matching funds contributed by teacher members to full payment of all pensions of retired teachers. It seems almost unbelievable that the legislature intended to permit a distribution which would destroy a fund built up for many years as security for payment of pensions and at the same time saddle the Board of Education with the obligations to pay all pensions without the right of the Board to channel the security to pay the obligation.

With so many imponderables facing us, it is impossible to pass on the constitutionality of the statute. We originally suggested the matter be first heard in the district court but counsel were of the opinion that all matters could be disposed of in this type of case. However, sometimes the haste sought by special writs results in long delays and unsatisfactory solutions. This happens to be one of those occasions. While counsel have suggested we issue the necessary order, if the Board of Education must be a party, such action is not desirable in view of the many rights which must be declared and which might be dependent on the plan of distribution adopted by the commission or the court.

In this instance we cannot end the litigation as all parties are not before us and we, therefore, must leave the many questions unanswered. It may be, however, that when all parties fully appreciate the unsatisfactory and hopeless confusion that may arise from acting pursuant to the statute they will be content to seek a better legislative solution.

The alternative writ of prohibition heretofore issued is recalled and a permanent writ denied. No costs allowed.

WADE, J., concurs.

McDONOUGH, J., not participating.

PRATT, Chief Justice.

I concur generally with what Mr. Justice LATIMER states in his opinion but I believe that we can decide rather definitely one or two points.

Section 75-29-15, U. C. A. 1943, which calls for prorating the funds to "annuitants" and "claimants" if they become deficient in amount, in my opinion carries no implication of legislative power to disburse the funds for the purpose of terminating the association. The section refers to "annuities" and "refunds *hereinbefore specified.*" (Italics added.) The italicized words refer to two specifications only: payments to retired personnel "annuities," (Sec. 75-29-11) ;

and "refunds" to claimants under Sec. 75-29-14 pertaining to the death of a member before retirement.

When Section 4757 of the Laws of 1917—now Sec. 75-29-8, U. C. A. 1943— made the retirement provisions of the association a part of the teachers' contract of employment, the above two contingencies were the only two that, by implication, if not expressly so stated in those contracts, became a possible liquidating limitation upon the rights that the teacher might acquire by complying with the provisions of the law pertaining to the association to the extent of a full performance of the contract relationships—that is by retirement. I find no implications in the law that reserve to any contracting party, or to the legislature, any right to disburse the funds—and in particular the permanent funds —for the purpose of dissolving the association as against the interests of those whose rights have vested by retirement.

In the light of the authority of the *Driggs* case, *(Driggs* v. *Utah State Teachers Retirement Board)*, 105 Utah 417, 142 P. 2d 657, the *Z. C. M. I.* case, and the trend of authority evidenced in the A. L. R. citations leading up to and included in *Talbot* v. *Independent School Dist.*, 230 Iowa 949, 299 N. W. 556, 137 A. L. R. 249, I am of the opinion that the legislative picture before us is this:

A teacher who has served the required length of time and made the required contributions under a contract providing for retirement at the end of that time, and after those contributions, and who has been retired pursuant thereto has acquired a vested right in the accumulated funds that will defeat any attempt by the legislature to terminate the relationship by a disbursement of the funds in any way contrary to the implications of the section of the code discussed above. The matter of contributions to the fund is not something merely between two contracting parties, the individual teacher and the Board of Education. All participants are interested in the contributions of each; and the resultant

fund is not just a group of individual contributions each traceable to its source, and thus earmarked for individual refund. The funds are a unit in which the retired member has acquired an interest commensurate with the purposes of the association. That retired member cannot be deprived of that interest by legislation, the sole purposes of which appears to be a termination of the association, for a reason other than contemplated by Section 75-29-15 above, as I have interpreted that section. Particularly is this true of a situation such as the present where the power to determine the continued existence of the fund lies in the hands of members of the association who, by reason of the youth of their membership in the association, have interests antagonistic to the vested rights of the retired personnel.

In view of the fact that we do not have all interested groups before us, nor do we have evidence before us of the relationship of the individual contracting parties as between themselves, I must limit my expressions of opinion to the legislative picture I have set out above. The remedies the retired personnel may have, if, by proper legislation, members may be relieved from future participation in the association, will have to be determined upon proper issues drawn with the adversely interested parties before the court as indicated by Mr. Justice LATIMER.

WOLFE, Justice (concurring).

I concur. Mr. Justice LATIMER has done a helpful piece of work in tracing the development of local teachers' retirement associations in this state. He has also pointed out many of the difficult questions which are presented by the proposal of the retirement commission to dissolve the association pursuant to the 1949 amendment and why in the instant proceeding, because of the absence of the Board of Education of Ogden City as a party, we are unable to determine the constitutionality of that amendment. With the sole objective in mind of aiding counsel for the parties in any further litigation which may hereafter be had in regard

to the dissolution of the retirement association, I will state what appears to me as a possible ground upon which the 1949 amendment can be upheld as constitutional. It is to be borne in mind that nothing said in this opinion or in any other opinion in this case is a pronouncement of this court nor, we assume, the final opinion of any member of this court. We wish to leave all questions open for further argument and final determination in any subsequent proceeding which may be had where all necessary parties are present.

As stated in the opinion of Mr. Justice LATIMER, Mrs. Newcomb as a part of her contract of employment with the Board of Education of Ogden City became entitled to an annuity upon her retirement. Chap. 70, Sec. 9, Laws of Utah, 1917, provided that every teacher who accepted employment with the Board of Education of a first or second class city in which a teachers' retirement association had been theretofore organized became a member of such retirement association by virtue of his employment. As a member of a retirement association the plaintiff was obligated to contribute a certain percentage of her annual salary to the association and the Board of Education was obligated to match her contribution. The annuity to be paid to her upon retirement was not a gift, but in effect compensation for past services performed. *Gubler* v. *Utah State Teachers' Retirement Board*, 113 Utah 188, 192 P. 2d 580, 2 A. L. R. 2d 1022.

In the case of *Driggs* v. *Utah State Teachers Retirement Board*, 105 Utah 417, 142 P. 2d 657, this court held that under the State Teachers' Retirement Act a retired school teacher had a vested right to a pension in the amount to which he was legally entitled at the time of his retirement. Thus it would seem to follow in the instant case, that Mrs. Newcomb upon her retirement in 1938 acquired, by virtue of the statutes in effect as of that date, a vested right to an annuity of $600 unless the funds of the retirement association were insufficient to pay the full amount of all claims for refunds and annuities made against it, in which

case she would be entitled to her prorata share of the "funds that are available." Whether by the phrase "funds that are available" the legislature meant only "current funds" or both "current" and "permanent" funds is not clear. The act provides that "current expenditures" are to be paid out of "current funds" only, but does not define what constitutes a "current expenditure" and does not state whether an annuity payment is a "current expenditure." I am inclined to think that the payment of an annuity is a "current expenditure" and hence can be paid only from "current funds." This does not mean, of course, that upon *dissolution* the plaintiff would not be entitled to share in the distribution of the permanent fund. As to how the funds should be distributed upon dissolution, I express no opinion.

An argument may be made that Mrs. Newcomb did not acquire upon her retirement a vested right to an annuity of $600 or her prorata share of the "funds" available. Under Section 75-29-8, U. C. A. 1943, which was in effect at the time of her retirement, the retirement commission is given the authority to increase or decrease the rate of salary deductions subject to the approval of $\frac{2}{3}$ of the members of the association and the board of education. Thus it can be argued that Mrs. Newcomb could not legally complain if the commission lowered the salary deduction rate so low that the financial demands upon the association greatly exceeded the proceeds coming into the association from teachers' salary deductions and matching funds paid by the board of education, and hence the association could pay Mrs. Newcomb only a nominal amount as her prorata share of the "funds" available. The difficulty with this argument is that it is very doubtful whether the legislature intended that the power given to the commission to increase or decrease the salary deduction rate be used by the commission to dry up the replenishing sources of the funds. It is more reasonable to conclude that the legislature intended that that power be used by the commission to raise

and lower the deduction rate as the demands upon the association varied from time to time with the view in mind at all times to keep the association solvent.

The plaintiff's complaint, however, is not that the commission now proposes to reduce the contribution rate so low that she will receive only a nominal amount as an annuity, but that the commission pursuant to the 1949 amendment now proposes to terminate the association. It is contended by counsel for the association that it is necessary to terminate the association because the annuity plan is actuarially unsound. I have found no authority from jurisdictions adopting the rule which we did in the *Driggs* case, supra, i. e. that a retired school teacher has a vested right to an annuity in the amount to which he was entitled upon his retirement (whether the amount be certain as in the *Driggs* case or certain subject to a condition as in the instant case) holding that, because a public retirement system is actuarially unsound, the legislature may *terminate* the system without providing the retired pensioners with a substantial substitute for that of which they were deprived. It may be admitted for the purposes of this case that the legislature could alter, amend or modify the retirement system in order to strengthen its fibres and make it actuarially sound. But amending, modifying and altering is not the same as termination.

In *Board of Education in Louisville* v. *City of Louisville*, 288 Ky. 656, 157 S. W. 2d 337, the legislature of Kentucky had provided for the merging of local teachers' retirement associations with the state teachers' retirement association because the local associations were actuarially unsound. The statute authorizing the merger provided that if merger was effectuated, the state association must assume the obligations of the local associations. Had the statute not so provided, the court indicated, the rights of retired teachers in the local retirement associations would be impaired. The Supreme Court of California recently held in *Kern* v. *City of Long Beach*, 29 Cal. 2d 848, 179 P. 2d 799, that a pen-

sion system may be terminated if those who have acquired vested rights therein are given a substantial substitute for that which they lose.

As heretofore stated, the plaintiff by virtue of her contract of employment with the Board of Education of Ogden City acquired a vested right to an annuity upon her retirement. The amount of the annuity was to be measured by the provisions of the retirement act in effect at the date of her retirement and was to be paid from the funds of the retirement association to which the plaintiff by her contract was required to contribute. It may well be that the Board of Education of Ogden, however, being the party with whom the plaintiff contracted, is the party ultimately or primarily responsible for the payment of the annuity to the plaintiff and thus if pursuant to the 1949 amendment the retirement association is terminated, the Board of Education of Ogden City may have to pay the plaintiff's annuity directly to her or provide other means by which she will receive the annuity. There is nothing in the 1949 amendment which purports to relieve boards of education from their obligations, if any, to retired teachers who have acquired vested rights to annuities. The amendment merely authorizes the abolishing of the instrumentality by which and the fund out of which the annuity was to be paid. Thus it may be that if the association is terminated, the Board of Education of Ogden City will have to determine and pay to the plaintiff an amount equal to what she would have received had the association not been terminated. If this is so, then there can be no objection made against the 1949 amendment on the ground that it impairs the plaintiff's vested right to an annuity. Whether the amount of the annuity which the Board may have to pay in case of dissolution should be determined upon the basis of the salary deduction rate existing at the time of the termination of the association and on the number of teachers employed by the Board each year, or upon some other basis will have to be determined. It can readily be seen that the possibility

that the Board of Education may have to respond to pay the annuities of teachers who are deprived of them by the termination of the retirement association, makes it imperative that the Board be a party to any proceeding to determine the constitutionality of the 1949 amendment.