263 P.2d 561

**BACKMAN  v.  BATEMAN et al.**

**TANNER  v.  BATEMAN et al.**

Nos. 8052, 8064.

Supreme Court of Utah.

Nov. 13, 1953.

23. Startin v. Madsen, Utah, 237 P.2d 834; U.R.C.P. 61.

24. Ibid.

154

Marr, Wilkins & Cannon, Paul B. Cannon, Salt Lake City, for plaintiff.

E. R. Callister, Jr., Atty. Gen., John W. Horsley, Asst. Atty. Gen., for defendants.

CROCKETT, Justice.

Original proceeding in this court to test plaintiffs' rights to continue as school principal (Backman) and school teacher (Tanner) under a newly enacted revision of our anti-nepotism statute.[1]

[1] 52-3-1, U.C.A.1953 (1953 Supp.)

The pertinent portion reads as follows:

"It is unlawful for any person holding any position the compensation for which is paid out of public funds to retain in employment or to employ, appoint, or vote for the appointment of, his * * * brother * * * [certain other named relatives] when the salary * * * of such appointee is to be paid out of any public funds; and it is unlawful for such appointee to accept or to retain such employment in all cases where the direct power of employment or appointment to such position is or can be exercised by any person within the degrees of consanguinity or affinity herein specified, or by a board or group of which such person is a member."

This statute is more comprehensive than its predecessor[2] in that instead of being limited to named classes of officials with hiring power, it refers to all persons holding positions the compensation for which is paid out of public funds, whether employee or employer, and purports to apply whether the latter does in fact do anything affirmative in employing or retaining his relative in office or not.

The principles governing both cases being the same, they were consolidated. We first treat the suit brought by Ralph V. Backman. The facts recited are based upon the statement of the plaintiffs, which

[2] 52-3-1, U.C.A.1953.

the defendants in their brief concede to be "accurate and complete."

Mr. Backman is 49 years of age, was born and has lived his life thus far in Salt Lake City. He owns his own home where he presently resides with his wife and five children; they are all integrated into various aspects of community life. He has been employed by the Salt Lake City Board of Education (hereinafter called the Board) continuously for the past 27 years. He began as a teacher and has progressed by several upgrading steps until he became principal of the South High School in 1948, in which position he has since served. He has met the educational and other standards set up for the various positions he has held to the satisfaction of the Board when he was originally hired and on each renewal of his contract since.

Further admitted facts are: That it is doubtful that he could secure employment as a principal in another school district of this State; no other district has high schools of comparable size to those of Salt Lake City and none pays as high a salary for such position. All during his employment he has been required by law to be a member of the local Teachers' Retirement Association, the funds for which are supplied by deductions from teachers' salaries, at the present time being 2% of the maximum of $2,500 and an equal amount contributed by the Board. To be eligible for benefits he must have taught 30 years and be a member of the Association at the time of retirement. If he cannot continue his employment by the Board he will lose all benefits of the Teachers' Retirement Association including the amount he has personally contributed. The Board employs its teaching personnel (including principals) under an annual written contract, but "has a tenure policy of renewal of these contracts when its teaching personnel are doing entirely satisfactory," which qualification Mr. Backman meets.

At a meeting of the Board a resolution was passed authorizing his continuance in his job for the next school year. His brother, LeGrand Backman, who first became a member of the Board years after Ralph V. Backman was hired, did not participate in this action. Ralph V. Backman had previously indicated his desire to be so employed. Therefore, he had a contract to work for the school year 1953–54, except only if the statute in question prevents him from being so employed.

Pursuant to statutory authority,[3] Superintendent of Salt Lake City Schools (M. Lynn Bennion) requested an opinion from the State Superintendent of Public Instruction (E. Allen Bateman) as to the effect of the new anti-nepotism statute upon the employment of plaintiff. On advice of the Attorney General (E. R. Callister, Jr.) Bateman notified Bennion that it would be unlawful to employ Ralph V. Backman "dur-

3. 53-3-4, U.C.A.1953.

ing the time his brother is a member of the Board," whereupon plaintiff was notified that the Board could not employ him for the sole reason of the alleged statutory prohibition; which laid the foundation for this action.

Mr. Backman contends that if this statute is interpreted and applied as suggested by the defendants, it would have the effect of destroying his employment and all of the advantages incident thereto—his preferred position in grade, pay, seniority—and cause him to lose the benefits which have accrued to him under the Teachers' Retirement Association. His argument is that for the law to thus forcibly compel him to uproot himself, his family, his home and destroy the career to which he has devoted his life because of a circumstance over which he has no control, is unreasonable and arbitrary in the highest degree and is a violation of his constitutionally guaranteed liberties, his right to work, and that it deprives him of property without due process of law.

Generally speaking, the state may prescribe the conditions upon which it will allow work to be done in its behalf,[4] yet regulations pertaining to public employment cannot discriminate against individuals or classes without a reasonable basis therefor related to the public good, nor deprive persons of their liberty or property without due process of law.[5]

That Mr. Backman's interest in his employment involves a constitutionally guaranteed liberty seems so certain as not to admit of argument. This court observed in the case of McGrew v. Industrial Commission:[6]

"Thus one may be said to have a special property in his profession or calling by means of which he makes his support, and he can be deprived of it only by due process of law. * * * The right to work, the right to engage in gainful occupations, the right to receive compensation for one's work are essentially property rights."

Such right is indeed one of the most important of the liberties vouched safe to one in our society. It was so regarded by the framers of our state constitution. Article XII, § 19: "Every person in this State shall be free to obtain employment whenever possible". Upon which we commented in State v. Packard,[7] "This freedom to work complements and makes more meaningful the other rights guaranteed as part of our constitutional liberties." And further in Block & Griff v. Schwartz,[8] this court through Bartch, J. cogently observed, "An enactment * * * which deprives a person arbitrarily of his property, or some part *of his personal liberty*, is just as much inhibited by the supreme law as one which

4. Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 127, 48 L.Ed. 148.

5. Opinion of the Justices, 303 Mass. 631, 22 N.E.2d 49, 123 A.L.R. 199.

6. 96 Utah 203, 85 P.2d 608, 610.

7. Utah, 250 P.2d 561, 563.

8. 27 Utah 387, 76 P. 22, 25, 65 L.R.A. 308.

would deprive him of life." (Emphasis added.)

It should be observed further that—under the facts here presented—Mr. Backman had a contract to work. Based on the tenure policy of the board he had every reason to expect that he could continue in his job so long as his work was satisfactory; the board had passed its resolution hiring him for the next year which he had accepted. This amounted to an agreement for his continuance in employment which vested in him a property right. This is not disputed; the Attorney General makes no contention to the contrary; nor does he question the jurisdiction of this court to hear this cause, but on the contrary the defendant joins in the request that we entertain and determine the matter, which would be maintainable only if such a right were in jeopardy. A property right existed also in the benefits which had accrued to him in the Teachers' Retirement Association, and which would be lost if his employment does not continue.

It cannot be gainsaid that the personal liberties and property rights of plaintiff which this statute might abrogate, are of paramount importance and that they should be safeguarded to the highest possible degree consistent with the public good. They should not be made to yield to mere convenience or expediency, nor sacrificed to the exigencies of special circumstances, even though some abuses may exist, if their elimination requires the arbitrary violation of these constitutional liberties. This court has noted that "great caution must be observed in permitting encroachments upon basic rights, assured by the constitution, and such restriction can be effected only in accordance with constitutional prerogatives * * *." [9]

The only basis upon which the proposed limitation of these rights could be justified would be under the police power to protect the public health, morals or welfare. It is true that when such matters are involved the police power is broad in its scope,[10] but it is not without limit. It must be measured in relation to the above referred to constitutional rights. There must exist an evil of a substantial nature, the correction of which would serve the public welfare,[11] and the law must be such as could reasonably be supposed to tend toward the accomplishment of that purpose.

We are fully aware that it is not the prerogative of this court to question the wisdom of the legislature. But where the validity of a law which would infringe upon important constitutional liberties and property rights of citizens is questioned, it is not only permissible, but our duty to look

9. See footnote 7 supra.

10. State ex rel. Cox v. Board of Education of Salt Lake City, 21 Utah 401, 60 P. 1013; 16 C.J.S., Constitutional Law, § 175a.

11. Cooley, Constitutional Limitations (8th ed.) 1228.

beyond the first blush impression of the enactment to see whether there is a sound basis to justify such use of the police power; that is, whether there is an evil of a substantial nature affecting the public welfare at which the legislation is aimed, and whether it could reasonably be supposed to tend toward the accomplishment of that purpose. The extent to which such rights can be limited must bear some reasonable relationship to the seriousness of the evil which is sought to be corrected. As has been said of old, "It is unwise to burn a barn to get rid of a mouse."

The vice at which anti-nepotism statutes are aimed is avoiding inefficiency in public office by preventing officials from favoring their relatives and appointing those who may not be qualified to serve. In one of the earliest cases dealing with the subject, the basis upon which such statutes are held valid was stated by the Supreme Court of Idaho:[12] "* * * we believe it to be within the legislative power to prohibit officers from appointing persons to office related to them * * * in the interest of efficiency in public service * * * as a legitimate police regulation, * * * and reasonable legislation in regard thereto is constitutional and enforceable." The same idea was announced by the Supreme Court of Florida,[13] which stated, "adequate protection against appointments other than up-

on approved merits, * * * is all that an 'anti-nepotism' law can constitutionally be supposed to cover and still remain within the police power, under the guise of which it is enacted." Numerous other authorities so affirm.[14]

We agree that statutes which prohibit public officials from choosing and hiring their relatives, serve the salutary purpose of preventing selection of employees on the basis of favoritism to relatives rather than on merit. Such laws tend to make for better efficiency in public office, and are therefore a valid exercise of the police power. The authorities referred to, however, are concerned with anti-nepotism laws prohibiting the *hiring* of relatives in the original instance. Thorough research by ourselves and capable counsel has failed to discover any nepotism law which goes as far as this new Utah statute in that it proposes to *interrupt and destroy* the employment of persons who *had been lawfully hired* and had continued to work under the identical conditions for years. This presents a greatly different problem.

Under this statute employees who have been hired by boards or commissions in no way related to them and therefore presumably upon their qualifications for their jobs, and who have become more proficient therein by years of experience, are declared to be in violation of law on July 1st and

12. Barton v. Alexander, 27 Idaho 286, 148 P. 471, 475.

13. State ex rel. Robinson v. Keefe, 111 Fla. 701, 149 So. 638.

14. See 88 A.L.R. 1103.

thereafter, merely because some relative within one of 19 classes named is a member of a board or commission by which the power of employment "is or can be" exercised, whether the relative had anything whatsoever to do with employing or retaining him in his position. Paradoxically this would be so even if the relative did everything in his power to prevent the employment of, or to discharge the employee. The same result would inure to an employee who had previously been in employment, if any such relative at any later time, became a member of such a board. Where an employee was hired when no relative was a member of the board, and where no relative does any affirmative act, directly or indirectly to employ or retain him, and further, has no power of supervision, how can it fairly be said that the bare fact of relationship would make for appointments of incapable employees or in any way tend to foster inefficiency in public office? The answer seems obvious: There would be none; or at least the chance thereof would be so extremely small that it could not properly be regarded as an evil of a substantial nature.

As compared with the relatively negligible harm which might come from the sole fact of relationship as above discussed, far-reaching and drastic are the effects of this statute upon the lives and careers of plaintiffs and other capable and faithful public employees who have given many years to a particular job. Persons who had obtained employment on merit in the first place, and who had virtually given their working lives to making a career of such pursuit, simply by continuing to work under the same conditions which had existed for years, following what was theretofore a career of honorable service, are by this statute declared to be guilty of crime on July 1st; their plans are upset and the economic basis of their lives, upon which all its other aspects—social, religious and family—must devolve, is destroyed because of a circumstance arising through no fault of theirs and wholly beyond their control, and bearing little or no relationship to their capacity to render efficient service.

In addition to the foregoing, even if we should assume that some sufficient evil might result from the sole fact of relationship to warrant the invocation of the police power for the purpose of curtailing it and promoting efficiency in public office, an analysis of this effect of the statute makes it appear that it would not in fact serve such purpose, but the result would in all likelihood be to the contrary.

Public employment is already fraught with numerous disadvantages: the generally meager monetary rewards, presently existing uncertainties of tenure, public indifference to ability, diligence and merit, contrasted with ever-ready criticism for any lack therein; the necessity of living a "goldfish bowl" life, open to public scrutiny, the constantly present possibility of being pilloried for any mistake or indiscre-

tion, are factors which definitely discourage many capable people who might otherwise desire to follow a career of some type of public service from doing so. It is well known that such considerations even now make it difficult for public agencies to compete in the labor market for qualified employees. Add to this the possible effects of this statute: suppose, for instance, a young man who is capable, well educated, qualified as an engineer, accountant or specialized in some other field, were considering two positions—one in private industry—one in public employment; how could the latter compete in bidding for his services if in taking such job he would be under the constant hazard that if any relative of his of the 19 classes enumerated became a member of the board at any time during his career, his position and all·he had invested in it would be ipso facto destroyed? If this hazard were added to the already existing disadvantages of public employment the difficulty in inducing efficient personnel to take such jobs would be greatly increased and the net effect of the statute, in all probability, would be to decrease rather than increase efficiency in public employment. It is obvious that a statute cannot properly be justified as an exercise of the police power for the accomplishment of a purpose unless it could reasonably be regarded as calculated to effectuate the purpose; conversely if it appears that it would be wholly unreasonable to believe that the statute would tend toward the accomplishment of the purpose, violation of the individual rights involved would not be warranted.

Cognizant as we are that every doubt must be resolved in favor of constitutionality,[15] we are nevertheless of the opinion, and hold that the retroactive effect of this statute which would prohibit employees from continuing in their erstwhile lawful employments, solely because of relationship, where the relative does nothing to appoint or retain, nor has any power of supervision or control over the employee, would amount to an unwarranted infringement upon rights guaranteed to individuals under our constitution and is therefore invalid.

The same principles apply in the case of Mathias C. Tanner. The school boards are therefore at liberty to follow their desires in employing the plaintiffs. Due to the fact that this suit has been conducted on a friendly basis there seems to be no necessity for issuing any order to implement this opinion.

No costs awarded.

WADE, J., concurs.

WOLFE, Chief Justice (concurring specially).

I am in general agreement with the proposition that the Legislature has the power

15. Newcomb v. Ogden City Public School Teachers' Retirement Comm., Utah., 218 P.2d 287; Hansen v. Public Employees Retirement System Board of Administration, Utah, 246 P.2d 591.

to prescribe the conditions upon which it will allow work to be done for the State or for one of the political subdivisions of the State. It was upon this ground that the Supreme Court of the United States in Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 127, 48 L.Ed. 148, held constitutional a statute of Kansas which made it unlawful for any one thereafter contracting to do any public work to require or permit any laborer to work longer than eight hours per day and which required such contractors to pay the current rate of daily wages. The statute was attacked as being in derogation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. Said the Court:

"* * * we can imagine no possible ground to dispute the power of the state to declare that no one undertaking work *for it or for one of its municipal agencies* should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people; and having control of its affairs, to prescribe the conditions upon which it will permit public work

to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern.

"If it be contended to be the right of every one to dispose of his labor upon such terms as he deems best,—as undoubtedly it is,—and that to make it a criminal offense for a contractor for public work to permit or require his employee to perform labor upon that work in excess of eight hours each day is in derogation of the liberty both of employees and employer, it is sufficient to answer that no employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do.

\*　　\*　　\*　　\*　　\*　　\*

"Some stress is laid on the fact stipulated by the parties for the purposes of this case, that the work performed by defendant's employee is not dangerous to life, limb, or health, and that daily labor on it for ten hours would not be injurious to him in any way. In the view we take of this case, such considerations are not controlling. We rest our decision upon the broad ground that the work being of a public

character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done. Its action touching such a matter is final so long as it does not, by its regulations, infringe the personal rights of others; and that has not been done."

Upon this same elementary principle that the State may prescribe the conditions upon which it will allow work to be done on its behalf, statutes or ordinances have been upheld as constitutional which (1) established a minimum daily wage to be paid laborers on public work, Malette v. City of Spokane, 77 Wash. 205, 137 P. 496, 51 L.R.A.,N.S., 686, Ann.Cas.1915D, 225, and Jahn v. City of Seattle, 120 Wash. 403, 207 P. 667; (2) prohibited the hiring of aliens on public works or gave citizens preference (see section 34–12–1, Utah Code Ann.1953) Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206, Ann.Cas.1917B, 287; Crane v. People, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218; and Jahn v. City of Seattle, supra; (3) gave preference for hiring on public works to persons who had resided in the state six months or more, Ebbeson v. Board of Public Education in Wilmington, 18 Del.Ch. 37, 156 A. 286; (4) gave preference in hiring on public works to war veterans, State ex rel. Raines v. City of Seattle, 134 Wash. 360, 235 P. 968. The principle found an interesting application in Seattle High School Chapter 200 of the American Federation of Teachers v. Sharples, 159 Wash. 424, 293 P. 994, 996, 72 A.L.R. 1215 where an action was brought to enjoin the directors of a school district from enforcing a resolution adopted by the board of directors that no teacher would be employed or continued in employment while he or she was a member of the American Federation of Teachers and that each teacher hired by the board should sign a declaration that he is not and would not become a member during the term of his contract. The contention was made that the resolution was not a proper exercise of the police power, but the court held that "the right of the state and its municipalities to say upon what conditions a public work shall be or not be performed is not a right arising from the exercise of the police power" but that the right rested upon the "simple ground that 'it belongs to the state as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.'"

It was also contended in that case that the resolution of the board was in derogation of the due process clause of the Constitution of Washington and of the Fourteenth Amendment to the Constitution of the United States. The court recognized that a teacher had the right to follow his profession, but stated that "the right of freedom of contract as it exists in this case to refuse for any reason or no reason at all to engage the professional services of any person is in no sense a denial of the consti-

tutional right of that person to follow his chosen profession."

While I find nothing in the case of Atkin v. Kansas, supra, which suggests' that the conditions imposed by the State upon public employment must be reasonable, such a qualification was made in the Opinion of the Justices, 303 Mass. 631, 22 N.E.2d 49, 57, 123 A.L.R. 199, where the Justices advised the Senate and House of Representatives of Massachusetts that certain proposed statutes which would exclude all married women from public employment of every nature and would prohibit both a husband and wife from being employed by the State would be unconstitutional. Said the Justices:

"Undoubtedly the General Court [Legislature] under the Constitution has broader power to deal as employer with employees than to regulate the conduct of the general public. But it does not follow that there are no constitutional limitations upon the power of the General Court as employer. The General Court does not in all particulars have the same freedom of action as a private employer with respect to the employment of citizens.

"* * * Since it (the General Court) is a public agency directing the expenditure of money raised by taxation, it cannot make arbitrary discrimination and favor the employment of one class of citizens to the exclusion of others."

The Justices concluded that a statute which would exclude married women from public employment could have no real tendency to advance the public welfare but would merely advance the welfare of a particular class of citizens at the expense of another class.

In the two cases before us, the Legislature has by Chap. 79, Laws of Utah 1953, determined that it will not permit the hiring of any person by the State or by any of its political subdivisions when the power of appointment is or can be exercised by a person who is related within specified degrees to him, or by a board of which such latter person is a member. As expressed by Chief Judge Willard Bartlett in his concurring opinion in People v. Crane, 214 N. Y. 154, 108 N.E. 427, L.R.A.1916D, 550, and quoted by Justice Folland in his dissenting opinion in Bohn v. Salt Lake City, 79 Utah 121, 8 P.2d 591, 609, 81 A.L.R. 215:

"The statute is nothing more, in effect, than a resolve by an employer as to the character of his employees. An individual employer would communicate the resolve to his subordinates by written instructions or by word of mouth. The state, an incorporeal master, speaking through the Legislature, communicates the resolve to its agents by enacting a statute."

If, as required by the opinion of the Justices, supra, there must be a reasonable basis for a legislative act excluding a class of taxpayers from public employment, I

cannot say such a basis does not exist here. The evils of nepotism are well known and it was within the prerogative of the Legislature to attempt to eliminate that evil. As an aside, however, I think it must be admitted that in the case of teachers in our public schools, the evil is not found in the degree that it may exist in the case of other employees of the State or its subdivisions. In most respects, our public schools are safeguarded by statute against the evils of nepotism. Teachers are professional people certificated by the State Department of Education. They are hired by annual contracts by a board of local citizens—not by a single employer. Their pay is set according to fixed standards; there is usually no variation in pay between teachers with the same educational achievement and teaching experience; hence there is little opportunity for a board of education to pay one teacher more than another unless some basis in fact exists. School must be in session a required number of days each year. Indeed, the operation of the public school system does not lend itself with ease to the evils of nepotism as does other public employment.

Aside from the matter which I will next consider, I conclude that Chapter 79 is constitutional, not upon the ground that it is a proper exercise of the police power of the State, but upon the ground that it is a reasonable condition imposed by the State as an employer upon the right to seek or be retained in public employment. It is therefore unnecessary for me to consider the contentions made by the plaintiffs that said law is not within the realm of the police power of the State. A different question would, of course, be presented if the statute applied to private contract of employment.

In the case of Atkin v. Kansas, supra, the Supreme Court of the United States said: "Its [the Legislature's] action touching such a matter is final so long as it does not, by its regulations, infringe on the personal rights of others; * * *." I now consider whether the statute under consideration in this case infringes upon the personal rights of the plaintiffs.

As appears from the stipulation of facts in the *instant* cases, the plaintiffs are members of local teachers' retirement associations in their respective school districts. These associations were organized pursuant to section 53–28–1 et seq., Utah Code Annotated 1953, which authorizes their creation in school districts in cities of the first and second class. When an association has been organized in a district, all teachers in that district are required to join it and contributions to the retirement fund of the association are deducted from their salaries. The board of education of the district matches the contribution of the teachers. Upon reaching the age of sixty years and after teaching thirty years, a member is eligible for retirement and is entitled to receive an annuity of not to exceed $600.

Unlike most retirement systems there is no provision in the retirement act for returning contributions to members who leave the employment of the district in which the association is organized. The only authorization to return contributions is in the case of the death of a member before he retires. In such case, his contributions are returnable to any of his relatives who were dependent upon him for support. Section 53–28–14, U.C.A.1953. However, if a member accepts employment in another school district he may (1) transfer his membership to the association in that district, if one has been organized therein, or (2) he may continue his membership as an absent membership by sending to the association an amount equal to the contribution he would have made had he not left that district, plus the amount the board of education in that district would have contributed as matching funds. Section 53–28–13, U.S.C.A.1953.

The authorities are in agreement that the rights of members of a retirement system must be determined by the language and purpose of the act establishing or providing for the establishment of the system, and we have held, as it has been held in other jurisdictions, that teachers' retirement acts should be liberally construed to effectuate the purpose of such acts, viz., to provide security for teachers in the public schools and create an incentive for qualified persons to enter and remain in the profession. Driggs v. Utah State Teachers Retirement Board, 105 Utah 417, 142 P.2d 657, 663;

Newcomb v. Ogden City Public School Teachers' Retirement Comm., Utah, 243 P. 2d 941; Woods v. Reilly, 147 Tex. 586, 218 S.W.2d 437. So liberally have we construed teachers' retirement acts in favor of the teachers that we have held that when a member of a retirement system has fulfilled all conditions precedent to obtaining an annuity or a pension and has been placed on the retired list, he has a vested right to receive a pension in the amount provided for by the retirement act at the date of his retirement. Driggs v. Utah State Teachers Retirement Board, supra; Newcomb v. Ogden City Public School Teachers' Retirement Comm., supra. But until a member fulfills all the conditions precedent, he has no vested right to a pension or an annuity and the system may be abolished leaving him without the expectancy of a pension. Hansen v. Public Employees Retirement System, Utah, 246 P.2d 591. However, because a member prior to retirement does not have a vested right to a *pension* does not mean that he may not have vested rights in the *retirement fund* to which he has made contributions.

In view of the purpose of teachers' retirement acts and the rule that such acts should be liberally construed in favor of the teachers, I am led to the conclusion that members of local teachers' retirement associations in this state have an interest in the fund to which they have contributed and that that interest can only be extinguished in accordance with the provisions

of the act at the time they make their contributions. If a member voluntarily leaves the employ of the district in which the association to which he belongs has been organized; if he leaves because the board of education does not renew his contract; or if he dies while a member but leaves no dependent relatives, he knows that under the Act there will be no return of his contributions. But unless the Legislature impliedly reserved the right to deal in any manner it may choose with a member's contributions, he is assured by the Act that except (1) if he voluntarily withdraws from employment, or (2) if the board will not renew his contract, or (3) if he dies before retirement, he cannot be deprived of his interest in the fund.

We stated in Newcomb v. Ogden City Public School Teachers' Retirement Comm., supra, that it would not be consonant with the purpose of the local teachers' retirement act for us to hold that the Legislature reserved the right to abolish local retirement associations and thereby terminate the payment of annuities to retired teachers. We stated that such a reservation on the part of the Legislature would defeat its very purpose in providing for the organization of associations because teachers would have no assurance whatever of receiving retirement pay after they had fulfilled all the conditions precedent to receiving it. We quoted with approval from Kern v. City of Long Beach, 29 Cal.2d 848, 179 P.2d 799, 803, as follows:

"It is obvious that this purpose would be thwarted if a public employee could be deprived of pension benefits and the promise of a pension annuity would either become ineffective as an inducement to public employees or it would become merely a snare and a delusion to the unwary."

What was said by us in that case is apropos here. It would be highly incongruous with the purpose of the act for us to now hold that the Legislature reserved the right to make unlawful the continued employment of a few members of a retirement association after they had taught for a long period of time and made compulsory contributions to a retirement fund of which they have no way of obtaining a refund, when they and the board of education which employs them are willing and anxious that they continue their employment, simply because of the fortuitous circumstance that some one related to them gained election to the board many years after they joined the association. Had the act specified in express language that the Legislature reserved the right to work a forfeiture of their interest in the fund at any time and for any reason which occurred to the Legislature it is manifest that the beneficient purpose of the act would have been doomed to defeat at the outset. It strains my credulity to believe that the Legislature

intended to reserve any such power when it enacted the enabling act for local associations. The invitation of the act to make contributions toward retirement pay is as the court said in Kern v. City of Long Beach, supra, "a snare and a delusion to the unwary" if the Legislature can at any time, without abolishing the association, work a forfeiture of the interest in the fund of a few members of the association because of some fortuitous event, for which they are in no way responsible.

In 1949 when the Legislature provided for the dissolution of local teachers' retirement associations provision was made for the distribution of the funds of the association among annuitants, members and claimants. Chap. 91, Laws of Utah, 1949. Again, when the Legislature in 1951 abolished the Public Employees' Retirement System it provided for a return of contributions to those members who were not yet entitled to retirement benefits. Chap. 21, Laws of Utah 1951, First Spec.Sess. as amended by Chap. 4, Laws of Utah 1952, Second Spec.Sess. Thus it is arguable that the Legislature has in two instances recognized that members in a retirement system who have not qualified for retirement pay do have an interest in the funds to which they have contributed.

The plaintiffs Backman and Tanner have taught 27 years and 33½ years, respectively, in their districts. Most of those years of service were rendered before their brothers gained election to the board in the district in which they were employed. Chapter 79 would force the plaintiffs to leave the district in which they have taught for this many years, thereby terminating their membership in the retirement associations organized in those districts, and working a loss of their interest in the retirement fund to which they have contributed unless they can (1) find employment in another district in which an association has been organized to which they can transfer their membership, or (2) unless they choose to continue their membership in absentia by paying their contributions voluntarily, plus the matching contribution which the board of education formerly paid. The first alternative is speculative since there are only five cities in this state of the first or second class, and we are not apprised in how many of those cities associations have been organized to which the plaintiffs could transfer their membership if they should succeed in gaining employment in one of those districts. The second alternative is equally unsatisfactory since it requires those members to pay twice the contribution of other members in order to protect their interest in the fund.

I thus conclude that Chap. 79 as it affects the plaintiffs and other members of local teachers' retirement associations similarly situated is unconstitutional since it may work a forfeiture of the interest of those members in the retirement fund to which they have contributed. Further than this I cannot go at this time in declaring

the constitutionality of Chap. 79. It may be that in the case of other school teachers and other public employees there are certain vested rights which may be cut off by the retroactive feature of Chap. 79. Thus the constitutionality of the statute as it applies to persons other than the plaintiffs and those similarly situated must be determined upon the record in each case.

## McDONOUGH, Justice (dissenting).

I am unable to agree with the decision of the majority of my associates holding the anti-nepotism statute unconstitutional. Although I gravely question the wisdom of the action of the last regular session of the Legislature in extending the reach of the statute so as to include plaintiffs and those similarly situated, I find no interference with any vested rights of such class by virtue of its enactment. The authorities cited in the special concurrence of Mr. Chief Justice Wolfe amply support the rule laid down in Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 127, 48 L.Ed. 148, that "it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf". It is conceded that, absent any legislative interdiction, each of the Board of Education here indirectly involved might legally, in its discretion, refuse to employ or to retain in employment any applicant or teacher for whatever reason its judgment might dictate, unless, if conceivable, some personal right of the teacher be violated. It follows, I submit, that should such Board adopt a policy of not employing or retaining in employment any one related to a member of such Board within a stated degree of consanguinity, it could not be successfully contended that by refusing to continue in employment a person so related, who had long tenure as a teacher in such district and whose work had proved satisfactory, was thereby deprived of a property right. If this be so, it is difficult for me to see how a statute which precludes the Board from doing so has such effect.

Nor do I believe that the fact that each of the plaintiffs is a member of a local retirement association and has had periodically deducted from his salary a contribution to the retirement fund results in the statute being unconstitutional as applied to him. It is conceded in the opinion of the Chief Justice that should the Board of Education refuse to renew the contract of a teacher, no property right of such teacher is thereby violated though he has made contributions to the retirement fund and despite the fact that he may not, under the terms of the retirement law, withdraw such contributions. If this be true, the same reasoning applies to the contention that because of contributions made to the retirement fund, application of the statute to such contributor divests him of a property right, as applies to such asserted right ac-

quired by reason of long tenure and satisfactory work. Should the Board, in the example given above, refuse to continue a teacher in employment because of his close blood relationship to a member of the Board, it would no more divest such teacher of a vested right than such refusal based on an asserted personality defect or disagreement with a policy of the Board. And this is so because concededly a promulgation against nepotism may legally be made in furtherance of the public interest. It follows that a law which is enacted in furtherance of the policy which prohibits such employment is no more assailable than a resolution of the Board to the same effect.

The relief prayed for in the petition of each plaintiff should, in my opinion, be denied.

HENRIOD, Justice (dissenting).

I subscribe to the views of Mr. Justice McDonough. I believe also that the main opinion overlooks the letter and spirit of our own Constitution. Article VIII, § 15, in language as strong or stronger than that found in S.B. 235, prohibits, as to the judicial branch of government, employment of relatives under *any* circumstance when a judge is appointed or elected, whether or not the relative has been employed by the court for 27 years or any other period. That section reads as follows:

"No person related to any judge of any court by affinity or consanguinity within the degree of first cousin, shall be appointed by such court or judge to, or employed by such court or judge in any office or duty in any court of which such judge shall be a member."

Here is a constitutional interdiction, which most certainly recognizes the public welfare aspect of the problem. Who will declare this Constitutional provision unconstitutional? Every argument advanced in the majority opinion is as apropos to this provision as it is to S.B. 235. The clerk, the stenographer, or any other employee of a court loses his job when a judge related to him takes the bench,—even though he may have been employed for 27 years as Mr. Backman was, and even though he may have paid for many years into a state retirement fund. Yet the majority opinion says that a statute that prohibits nepotism in the Executive branch of government is constitutionally offensive and void, immunizing against loss of employment the clerk, the stenographer, or any other employee of a commission or board.

The opinion would allow continued employment as long as the employee, not his employer, pleases. If he has a vested right to his job, how could the Board refuse to renew his yearly contract? All of us have a right to work, *if* we can get a job, *if* we are capable of holding one, *if* we don't get fired, *if* we don't embezzle our employer's funds,—ad infinitum. Another "if" that affects the plaintiff's job is the statutory

directive that makes consanguinity a matter of disentitlement. Would the majority go so far as to say that because some one had built up a long tenure and had paid into a retirement fund, that he would have a vested right to teach communism where a statute prevented it? If the legislature doesn't want relatives working for relatives in public employment where taxpayers' money pays the freight, it would seem to be the business of the legislature, just as it is its business to say that we judges cannot sit for more than ten years on the bench without being re-elected, even though we may have many years behind us, have paid into the state retirement fund, and great hardship would accrue in the loss of employment.

The majority, it seems, has gone on a semantic voyage, forgetting to take the statute along as a passenger. It theorizes that personal liberties and property rights must be safeguarded, and then arbitrarily says in this case they are such as cannot be limited by the police power because such limitation would bear no "reasonable relationship to the seriousness of the evil which is sought to be corrected." It is suggested that such a conclusion is not justified.

The majority sees no harm in continuing the employment of one whose relative becomes his employer. I may see little harm in it either but the legislature did, and it is no answer to say the bounds of reason were exceeded because we see no harm in the situation. The main opinion stresses the hardship that the act produces, but harsh results, as such, cannot render legitimate legislation impotent for that reason. It also laments the plight of public servants, guessing that individuals would shun public office were we to declare the act valid. The answer is simple: If public office be unbearable under existing laws, no one need seek or hold it. The very liberty about which so much is said, guarantees alike the right of non-labor as it does that of employment. Lost jobs accrue to thousands each time the political pendulum makes its sweep. Hardly are they made secure by contribution to a fund, unless protected by job-security legislation.

The Chief Justice's opinion adds but a conviction that those participating in and having a vested interest in some sort of retirement plan have a vested right in their employment! Mr. Justice McDonough answers such contention completely.

For the Chief Justice to hold that the act is void because it would interfere with an interest in a retirement fund, is to hold that no statute can be passed to prevent or limit a public servant's employment if he happens to participate in some sort of retirement plan,—and if that is the law, I would favor a plan for retirement at birth. If that be the law, any anti-nepotism law would be emasculable by the simple device of creating and contributing to a fund. If that be

the law, the Board would have to hire an employee against its will.

An examination of the authorities makes it clear that nepotism in public employment is a legitimate subject for legislative attention.[1] As has been pointed out, the framers of our Constitution recognized the public welfare aspect of the practice as to one of the three branches of government. S.B. 235 is no different than the Constitutional provision against nepotism, except as it is applicable to the executive rather than the judicial branch of government, and it should be upheld, particularly where every presumption is indulged in favor of constitutionality and in favor of protecting taxpayers' money from abuse.

The main opinion says the vice at which anti-nepotism statutes are aimed is inefficiency in public employment by favoring relatives. This may be one of the aims of anti-nepotism acts, but I believe they are directed also, and more probably, against favoritism in employing kinfolk to the exclusion of other employables, when the compensation comes from taxes. At the root of anti-nepotism appears to lie the traditional and time-honored philosophy of our people that every one, having the ability and initiative, has an equal opportunity to advance his fortune,—ultimately, even, to the Presidency,—without unreasonable interference or roadblock born of favoritism toward kinship.

1. Barton v. Alexander, 27 Idaho 286, 149 P. 471.