Brent YONTS, Appellant,

v.

COMMONWEALTH of Kentucky, ex rel, David L. ARMSTRONG, Attorney General, Appellee.

Supreme Court of Kentucky.

Nov. 21, 1985.

John A. Pax, Greenville, for appellant.

David L. Armstrong, Atty. Gen., Kevin M. Noland, Gen. Counsel, Office of Attorney General, Frankfort, for appellee.

## OPINION OF THE COURT

The Attorney General filed this action pursuant to KRS 160.180 seeking to declare forfeited the office of Brent Yonts as a member of the Board of Education for the Greenville Independent School District. This office was declared so forfeited by the

Muhlenberg Circuit Court. The sole defense in that court and this was that the statute was unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States. The validity of the statute was upheld by the lower court, and we affirm, adopting the opinion of Honorable Dan Cornette, Judge of said court, as the opinion of this court.

"Brent Yonts, a young attorney of Greenville, Kentucky, was elected a member of the Board of Education for the Greenville Independent School District in November, 1978, and commenced his second term in January, 1983. In 1981, Mr. Yonts became a candidate for the democratic nomination to the office of Representative from the Fifteenth Legislative District in the Kentucky House of Representatives; as such, he was unsuccessful in the Democratic primary election of May, 1981. When the election to the Office of Representative next came around in 1984, Mr. Yonts again filed and ran for the Democratic nomination; again, he was not successful.

"On August 29, 1984, the Attorney General of the Commonwealth filed this action demanding that the courts declare Mr. Yonts to have forfeited his school board office; orders removing Mr. Yonts from the office are also sought.

"Kentucky Revised Statutes 160.180(1)(d) and (2) provide, mandate and compel that:

"(1) No person shall be eligible to membership on a board of education; or

\* \* \* \* \* \*

"(d) Who holds a state office requiring the constitutional oath or is a member of the general assembly; or

\* \* \* \* \* \*

"(2) *If, after the election of any member of the board, he* becomes interested in any contract with or claims against the board, of the kind mentioned in paragraph (f) of subsection (1) of this section, *or becomes a candidate for nomination or election to any office or agency the holding and the discharging of the duties of which would have rendered*

*him ineligible before election,* or he moves his residence from the district for which he was chosen, or if he does anything that would render him ineligible for re-election, he shall be subject to removal from office pursuant to KRS 415.050 and 415.060.

"It is, therefore, the law of the Commonwealth that when Mr. Yonts became a candidate for State Representative, quite clear grounds for his removal as a board member became permanently set. Such removal can only be accomplished by the Attorney General in suit such as the one at hand. The Attorney General took no action when Mr. Yonts made his maiden political voyage in 1981; indeed, there is nothing to indicate the Attorney General was notified of the 1981 candidacy.

"In his defense, Mr. Yonts seeks to avoid the plain and clear prohibition and import of the statute by pleading unconstitutionality by virtue of the United States Constitution; he specifically urges that his free speech rights (First Amendment to the U.S. Constitution) are struck mute by the statute, and he further contends that since the statute has the effect of preventing his unhampered quest for political office, it denies him equal protection of the laws (Fourteenth Amendment to the U.S. Constitution). Mr. Yonts, in this case, initially pleaded sections of the Kentucky Constitution, but subsequently withdrew those asserted defenses.

"The 'free speech' argument evokes but little reaction in this circuit court. The law complained of is generally called a 'resign-to-run' statute. The effect of the statute is not to impair Mr. Yonts' right of speech, but to bar him from continuing as an education board member if he chooses to run for political office. The general purpose and authority for these statutes was explained by the Kentucky Court of Appeals in *Adams v. Commonwealth, Ex Rel Buckman,* Ky., 268 S.W.2d 930 (1954), thusly:

" 'Ordinarily, the courts look to the legislature for declarations of public policy or of the public interest. Upon examining

the legislative enactments relating to boards of education, *we find running through them a clear expression of policy that such board members shall be divorced from political considerations.* (emphasis added)

" 'KRS 160.200 provides that elections for school board members shall be in the even-numbered years, the apparent purpose being to separate these elections from the regular elections for state and county offices. KRS 160.230 prohibits any party emblem on the school board ballot. KRS 160.250 forbids disclosing to the voters the political affiliation of any candidate for school board. KRS 160.-180(1)(d), in prohibiting a school board member from holding any office "under the city or county of his residence," indicates the legislative intent that school board members shall not take part as officers in local government affairs.' 268 S.W.2d at 932.

"The Supreme Court of the United States in 1982, in the case *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508, dispensed the current and last word on the constitutional health of 'resign-to-run' statutes. This case involved an attack on Article III, Section 19, of the Constitution of Texas, which provided:

" 'No judge of any court, Secretary of State, Attorney General, clerk of any court of record, or any person holding a lucrative office under the United States, or this State, or any foreign government shall during the term for which he is elected or appointed, be eligible to the Legislature.'

and a similar attack on Article XVI, Section 65 of the same constitution which provided:

" 'If any of the officers named herein shall announce their candidacy, or shall in fact become a candidate, in any General, Special or Primary Election, for any office of profit or trust under the laws of this State or the United States other than the office then held, at any time when the unexpired term of the office then held shall exceed one (1) year, such announcement or such candidacy shall con-

stitute an automatic resignation of the office then held.'

As noted by the Supreme Court, the challengers in that case seeking to smother those Texas legal restrictions with the weight of the U.S. Constitution, included county judges, justices of the peace, and constables-all wanting to run for another office without resigning-and twenty voters who alleged they would vote for the officeholder-plaintiffs if they were permitted by the courts to become candidates. The Supreme Court held these provisions of Texas law did not violate the First (free speech) or Fourteenth (equal protection) Articles of the U.S. Constitution. Some quotes from the Supreme Court follow:

" 'The Equal Protection Clause allows the States considerable leeway to enact legislation that may appear to affect similarly situated people differently. Legislatures are ordinarily assumed to have acted constitutionally. Under traditional equal protection principles, distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them. We have departed from traditional equal protection principles only when the challenged statute places burdens upon suspect classes of persons or on a constitutional right that is deemed to be fundamental.

" 'Thus, we must first determine whether the provisions challenged in this case deserve scrutiny more vigorous than that which the traditional principles would require.

" 'Far from recognizing candidacy as a fundamental right, we have held that the existence of barriers to a candidate's access to the ballot does not of itself compel close scrutiny. In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

" 'In assessing challenges to state election laws that restrict access to the ballot, this Court has not formulated a litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions.'

\*     \*     \*     \*     \*     \*

" 'Therefore, section 19 simply requires Baca (one of the plaintiffs) to complete his 4-year term as Justice of the Peace before he may be eligible for the legislature. At most, therefore, Baca must wait two years-one election cycle-before he may run as a candidate for the legislature.

" 'In making an equal protection challenge, it is the claimant's burden to demonstrate in the first instance a discrimination against (him) of some substance. Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution.

" 'In establishing a maximum waiting period of two years for candidacy by a Justice of the Peace for the legislature, section 19 places a de minimis burden on the political aspirations of a current officeholder. Section 19 discriminates neither on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office. Unlike filing fees or the level-of-support requirements, section 19 in no way burdens access to the political process by those who are outside the mainstream of political life. In this case, section 19 burdens only a candidate who has successfully been elected to one office, but whose political ambitions lead

him to pursue a seat in the Texas Legislature.

\*     \*     \*     \*     \*     \*

" 'It would indeed be a perversion of the Equal Protection Clause were we to conclude that Texas must restrict a Justice of the Peace's candidacy for all offices before it can restrict a Justice of the Peace's candidacy for any office.

" 'The Equal Protection Clause allows the State to regulate one step at a time, addressing itself to the phase of the problem which seems most acute. The State need not run the risk of losing an entire remedial scheme simply because it failed through inadvertence or otherwise, to cover every evil that might conceivably have been attached. (ibid, pages 969, 970)

" 'Thus, the automatic resignation provision in Texas is a creature of the State's electoral reforms of 1958. That the State did not go further in applying the automatic resignation provision to those officeholders whose terms were not extended by section 11 and section 65, absent an invidious purpose, is not the sort of malfunctioning of the State's lawmaking process forbidden by the Equal Protection Clause. A regulation is not devoid of a rational predicate simply because it happens to be incomplete. The Equal Protection Clause does not forbid Texas to restrict one elected officeholder's candidacy for another elected office unless and until it places similar restrictions on other officeholders. The provision's language and its history belie any notion that section 65 serves the invidious purpose of denying access to the political process to identifiable classes of potential candidates.

" 'As an alternative ground to support the judgments of the courts below, appellees contend that section 19 and section 65 violate the First Amendment (free speech). Our analysis of appellee's challenge under the Equal Protection Clause disposes of this argument. We have concluded that the burden on appellees' First Amendment (free speech) interests

in candidacy are so insignificant that the classifications of section 19 and section 65 may be upheld consistent with traditional equal protection principles.'

"It is, therefore, quite clear that the rationale of the Supreme Court in *Clements v. Fashing* is eminently dispositive of all constitutional criticisms which Mr. Yonts presents to the Kentucky statute. There is no aspect of the case at hand which is not covered and disposed of by the Supreme Court in the quotes presented above. Moreover, similarities and parallels abound: the Kentucky legislature has taken a step to remove school board matters from the political arena—a step which is most certainly appropriate and, indeed, wholesome for state action; as in Texas, Mr. Yonts could both serve on the school board and run for the legislature—all he had to do was wait until his term as board member expired before seeking the latter office; since the Supreme Court held Texas had a legitimate interest that justices of the peace should devote full and unhampered attention to their office, it cannot be seriously asserted Kentucky does not have the same legitimate interest with respect to school board members; and, finally, and in the word chosen by the Supreme Court, any impairment of Mr. Yonts' right of free speech is 'insignificant.' "

We would add to the opinion of the lower court that appellant contended during oral argument that KRS 160.180 violated the Kentucky Constitution. As the opinion of the lower court points out, this was an original defense in this action but was subsequently withdrawn. Having not been presented in the lower court, it is not subject to appellate review.

We would further add that the constitutionality of KRS 160.180(3) is not before us and nothing in this opinion should be construed as relating to the constitutionality thereof.

The judgment of the Muhlenberg Circuit Court is affirmed.

All concur except VANCE, J., who concurs in result only.