Virginia CHAPMAN, Ron Peace and V. Carolyn Chapman, Appellants,

v.

Chris GORMAN, in his official capacity as Attorney General of the Commonwealth of Kentucky, and the Office of Education Accountability, by and through Dr. Penny Sanders, its Director, in her official capacity, Appellees.

Nos. 91–SC–654–TG, 91–SC–659–TG.

Supreme Court of Kentucky.

Sept. 3, 1992.

As Amended Oct. 12, 1992.

Rehearing Denied Nov. 19, 1992.

Robert L. Chenoweth, John C. Fogle, III, Bryan, Fogle & Chenoweth, Frankfort, for appellants.

Chris Gorman, Atty. Gen., Robert V. Bullock, D. Brent Irvin, Asst. Attys. Gen., Civil Div., Mark R. Overstreet, Charles J. Cronan, IV, Stites & Harbison, Frankfort, for appellees.

Florence S. Huffman, Kevin M. Noland, Kentucky Dept. of Educ., Office of Legal Services, Frankfort, amicus curiae.

STEPHENS, Chief Justice.

Appellants, Virginia Chapman, V. Carolyn Chapman, and Ron Peace, challenge the validity of anti-nepotism statutes, KRS 160.180(2)(i) and KRS 160.380(2)(f), provisions enacted as part of the Kentucky Education Reform Act of 1990. Virginia Chapman and Ron Peace are long-time elected members of the Covington Independent Board of Education (hereinafter referred to as the Board). Virginia Chapman has continuously served in this post, initially having been elected in November of 1958, and most recently, having been re-elected in

November of 1990. Ron Peace similarly serves on the Board, first having been elected in November of 1974, and having been re-elected in November of 1988.

Appellant, V. Carolyn Chapman, daughter of Virginia Chapman, has been an employee of the Covington Independent School District since 1962; her current position is Director of Guidance. Ron Peace's wife, Norma, initially hired by the same school district in 1983, is employed as manager of a school bookstore.

Virginia Chapman and Ron Peace filed an action in the Franklin Circuit Court for declaratory and injunctive relief, attacking the constitutionality of KRS 160.180(1), (2)(i), which appears to render them ineligible to serve on the Board because of their relationship to school employees. V. Carolyn Chapman challenged the constitutionality of KRS 160.380(1)(a), (2)(f), which forbids superintendents of local districts from hiring a relative of a board member. The trial court upheld the constitutionality of the challenged provisions, dismissing appellants' complaint seeking declaratory and injunctive relief, granting instead, summary judgment in favor of the appellees— Frederic Cowan, in his official capacity as Attorney General of the Commonwealth of Kentucky, and Dr. Penny Sanders, in her official capacity as Director of the Office of Educational Accountability (hereinafter referred to as OEA). Pursuant to CR 76.-18(2), the instant appeal was transferred from the Court of Appeals to this Court.

## I. THE KENTUCKY EDUCATION REFORM ACT OF 1990

Appellants challenge anti-nepotism provisions, KRS 160.180(2)(i) and KRS 160.-380(2)(f), found within the Kentucky Education Reform Act of 1990 (hereinafter referred to as KERA); embodied in Chapters 156 through 163. The General Assembly enacted KERA, which radically changed the system of public education in this Commonwealth, following our decision in *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186 (1989). In *Rose, supra,* at 215, we declared that education is a basic fundamental right in Kentucky, guaranteed by Section 183 of our Kentucky Constitution. Section 183 provides that:

> The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State.

We acknowledged in *Rose, supra,* at 212, that there is a strong presumption of the constitutionality of enactments of the General Assembly. Yet after reviewing the facts presented, we determined that application of the former legislative framework resulted in constitutionally deficient common schools. Therefore, our opinion directed the General Assembly to "recreate and redesign a new system that will comply with standards we have set out." *Id.*

The following were included as essential and minimal characteristics of a constitutionally "efficient" system of common schools, as required by Section 183:

1) The *establishment, maintenance, and funding of common schools in Kentucky is the sole responsibility of the General Assembly,* and

6) Common schools shall *be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence. Id.,* at 212–213. (Emphasis added.)

Earlier in our opinion in *Rose, supra,* at 193, we noted that the trial court held that:

> An adequate school system must also include careful and comprehensive supervision at all levels to monitor personnel performance and minimize waste. If and where waste and mismanagement exist, including but not *limited to improper nepotism, favoritism,* and misallocation of school monies, *they must be eliminated, through state intervention if necessary.* (Emphasis added.)

We summarized in *Rose, supra,* at 216, that:

> the sole responsibility for providing the system of common schools lies with the General Assembly. *If they choose to delegate any of this duty to institutions such as the local boards of education, the General Assembly must provide a*

*mechanism to assure that the ultimate control remains with the General Assembly, and assure that those local districts also exercise the delegated duties in an efficient manner.* (Emphasis added.)

The evils of waste, duplication, mismanagement and political influence were thus identified by our Court in *Rose, supra,* as barriers against an efficient school system. The General Assembly, in response to this opinion, enacted KERA in 1990. The new statutes, as we shall illustrate, removed many personnel decisions from the control of the local school boards. This was a policy decision by the General Assembly to restructure the state-wide educational system.

All appointments, promotions, and transfers of school personnel, prior to KERA, were made upon the recommendation of the district superintendent, *"subject to approval of the board,"* under former KRS 160.380. (Emphasis added.) Thus, a majority vote of the district board members was required for any personnel actions. Likewise, reductions in pay and responsibilities, under former KRS 161.760; demotions, under former KRS 161.765; and terminations, under former KRS 161.790; required a majority vote of the school board members, the latter two actions also required a hearing before the Board voted.

New provisions in KERA serve to legislatively eliminate areas which were once fertile ground for favoritism and/or neoptism to take root. KRS 160.370, removes direct responsibility for the "hiring and dismissal of all personnel in the [school] district" from the school board, giving such power to the superintendent. Similarly, KRS 160.380(2)(a) provides that "[a]ll appointments, promotions and transfers of principals, supervisors, teachers, and other public school employees shall be made *only by the superintendent of schools ...*" (Emphasis added.) Reduction in a teacher's responsibility under KRS 161.760; demotion of administrative personnel under KRS 161.765; and suspensions and terminations of teachers under KRS 161.790; all are effected, under KERA, by the superintendent, the latter two actions pursuant to statute, provide for a hearing, upon request.

The General Assembly, further attempting to expunge the deleterious effects of nepotism from the common schools, provides under KRS 160.170, that an elected member of the board, before assuming duties of office, must take an oath "that he will not in any way influence the hiring or appointment of district employees." If this oath is broken, the violating board member will be removed from office, under KRS 415.050 and 415.060. *See* KRS 160.180(3).

Appellants assert that the previously enumerated provisions illustrate that responsibilities for hiring, promotions, transfers, assignments, etc. are now outside the purview of the local school boards and that whatever problems remain, pertaining to nepotism in the hiring of school personnel, are more than amply covered by KRS 160.-180(3), and by 161.164(3), (4). The latter statute provides that any board member who attempts "to influence the hiring of any school employee shall be subject to removal from office pursuant to KRS 415.-050 and 415.060." KRS 161.164(3), (4) prohibit board members from trading their influence in personnel matters for votes, and from basing personnel decisions on an employee's "political or religious opinions or affiliations or ethnic origin or race or color or sex or age or handicapping condition."

The new Act does place many personnel decisions that were previously under the district school board's control, now under the control of the superintendent, but local boards still retain numerous powers. Under KRS 160.350(1), boards are responsible for hiring and fixing the salary of superintendents. Boards also may discharge superintendents for cause, under KRS 160.-350(3), subject only to the approval of the chief state school officer.

KRS 160.370 provides that the superintendent "shall have general supervision ... of the general conduct of the schools, the course of instruction, the discipline of pupils, and the management of business affairs," but this is "subject to the *control of*

*the board of education."* (Emphasis added.) The superintendent is responsible "for the hiring and dismissal of all personnel in the district," pursuant to KRS 160.370, but this same provision designates that he "shall be the executive *agent* of the board that appoints him." (Emphasis added.)

The OEA, from a practical viewpoint, asserts that boards enjoy substantial and indirect control over superintendents, because superintendents are dependent on their board's continuing goodwill, since it is the board who appoints the superintendent for a term of "no more than four (4) years." KRS 160.350(1).

The General Assembly, in restructuring the system of common schools, through KERA, provides for further elimination of indirect political influence in personnel matters, in KRS 160.180(1), (2)(i) and 160.-380(1)(a), (2)(f).

KRS 160.180(2)(i) provides that:

(2) No person shall be eligible to membership on a board of education:

 * * * * * *

(i) Who has a relative as defined in subsection (1) of this section employed by the school district and is elected after July 13, 1990. However, this shall not apply to a board member holding office on July 13, 1990 whose relative was not initially hired by the district during the tenure of the board member.

Section (1) of KRS 160.180 defines "relative" as:

father, mother, brother, sister, husband, wife, son, daughter, aunt, uncle, son-in-law, and daughter-in-law.

KRS 160.380(1)(a), and (2)(f), read as follows:

(1) As used in this section:

(a) 'Relative' shall mean father, mother, brother, sister, husband, wife, son, daughter, aunt, uncle, son-in-law, and daughter-in-law.

(2)(f) No superintendent shall employ a relative of a school board member of the district, unless on July 13, 1990, the board member's relative is an employee of the district, the board member is holding office, and the relative

was not initially hired by the district during the tenure of the board member. A relative employed in 1989–90 and initially hired during the tenure of a board member serving on July 13, 1990, may continue to be employed during the remainder of the board member's term. However, the superintendent shall not promote any relative of a school board member who continues employment under the exception of this subsection.

Appellants challenge the constitutionality of a qualification for school board membership, as defined in KRS 160.180(2)(i), that prohibits anyone elected *after* July 13, 1990, from serving as a board member, who has a relative as defined within the statute, and that relative is employed by the district. KRS 160.180(2)(i) incorporates two exceptions in its disqualification restriction, a fact that the trial court noted:

1) The statute applies only to persons elected after July 13, 1990, and

2) The statute contains a grandfather clause, permitting persons holding office on July 13, 1990, whose relative was not initially hired during the board member's tenure, to serve additional terms.

KRS 160.380(2)(f), also constitutionally challenged by appellants, prohibits a school district from employing relatives of its school board members. Similar to exceptions found in KRS 160.180(2)(i), this section, as the trial court notes, provides that:

1) An employee may continue during the term of a board member relative who is serving on July 13, 1990, and

2) An employee may continue to be employed during subsequent terms of a member relative, serving on the effective date of the statute, if the employee was not initially hired during the board member's tenure.

Reading KRS 160.180(2)(i) and 160.-380(2)(f) together allows both board members and their relatives who were employed *during* the board member's tenure, before July 13, 1990, to continue in their respective positions, until the end of the board

member's current term, a fact noted by the trial court. Board members are barred from continuing to serve, when their term ends, though, if their relative remains employed by their school district.

Appellants frame constitutional challenges to KRS 160.180(2)(i), and KRS 160.-380(1)(a), (2)(f), on grounds that the statutes: (1) violate their First Amendment rights; (2) violate their rights expressed under the Equal Protection Clause; (3) are overbroad; and (4) deny procedural and substantive due process, and infringe familial rights of school employees.

## II. FIRST AMENDMENT

Appellants assert that their First Amendment rights are violated because the challenged statutes: 1) effectively foreclose their opportunity to seek and assume office as members of the school board (this results, appellants claim, since they face certain ouster if they are elected and take office while their "relatives" are employed by the school district); and 2) deny voters their fundamental right: a) to associate for the advancement of their political beliefs; and b) to express their political preference by casting their vote effectively (this results, appellants claim, because the statutes deprive the voters of their right to elect the disqualified board members).

## A. LEVEL OF SCRUTINY

■ The U.S. Supreme Court, in an opinion determining the constitutionality of Ohio's early filing deadline for independent candidates in primary elections, set out an analytical approach to be used when state election laws are constitutionally challenged:

> ... a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the state as justifications for the burden imposed by its rule. In pass-

ing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. *Anderson v. Celebreeze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

Utilization of this approach clearly forecloses any litmus-paper test to resolve the validity or invalidity of specific state election restrictions. *Id.,* quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). The Sixth Circuit, in *Zielasko v. State of Ohio*, 873 F.2d 957, 961 (6th Cir.1989), noted that the U.S. Supreme Court, in its *Anderson v. Celebreeze, supra,* opinion, obviously rejects summarily categorizing state election laws as being subject either to strict scrutiny or the rational relation test.

## B. MAGNITUDE OF ASSERTED INJURY

### 1. BOARD MEMBERS' INJURIES

The first factor to consider when applying the *Anderson* balancing test is the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. In this analytical section we focus solely on injuries alleged under the First Amendment.

■ The alleged injury to Virginia Chapman and Ron Peace, appellants who are school board members, does not involve a fundamental right because no such status is given to candidacy. *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972); *Yonts v. Commonwealth*, Ky., 700 S.W.2d 407 (1985). *See also*, J. Nowak, R. Rotunda, and J.N. Young, *Constitutional Law*, Chap. 16, § VIII, p. 776, (2d ed. 1983); L. Tribe, *American Constitutional Law*, § 13–19 (2d ed. 1988). The federal circuit courts of appeal, under Equal Protection Clause analysis, sometimes within the context of First Amendment challenges, as the trial

court observed, have adhered to *Bullock v. Carter, supra,* in holding that there is no fundamental right to candidacy. *See, Stiles v. Blunt,* 912 F.2d 260, 265 (8th Cir.1990); *Zielasko v. State of Ohio, supra; Hatten v. Rains,* 854 F.2d 687, 693 (5th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Plante v. Gonzalez,* 575 F.2d 1119, 1126 (5th Cir.1978), *cert. denied* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979).

Appellants, Virginia Chapman and Ron Peace, are only deprived of becoming candidates for re-election to the school board in the district where their relatives were hired as employees, after appellants initially took office as members on the Board. Appellants' candidacies thus, are not forever barred. If their relatives transfer to work in another school district, or change jobs entirely, appellants will no longer be foreclosed from seeking re-election to their posts. Moreover, appellants at present are only denied the opportunity to seek re-election to the school board as long as they fit within the disqualifying parameters of the statutes. Appellants remain free to seek every other office in the Commonwealth.

## 2. VOTERS' ASSERTED INJURY

■ We must similarly determine whether the asserted injury to voters' rights of association, and to express themselves under the First Amendment, are in fact implicated in this case, applying the *Anderson* test. Not all restrictions placed on a candidate's eligibility impose suspect burdens on fundamental rights of voters to associate and to choose among candidates. *Anderson v. Celebreeze,* 460 U.S. at 788, 103 S.Ct. at 1569; *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Generally, evenhanded restrictions on candidate eligibility that serve legitimate state goals, unrelated to First Amendment values, are upheld. *See, Anderson v. Celebreeze,* 460 U.S. at 788, 103 S.Ct. at 1570, fn. 9, citing *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1952).

First, we must note that we are not persuaded that appellants have standing to raise voters' claims under First Amendment challenges of the statutes. In cases assessing the impact of candidate eligibility requirements on the rights of voters, "one or more voters supporting the candidate are typically parties to the action." In *Anderson,* 460 U.S. at 783, 103 S.Ct. at 1566, suit was brought by independent presidential candidate, John Anderson, and three registered voters; in *Bullock v. Carter,* 405 U.S. at 136, 92 S.Ct. at 852, voters supporting candidates intervened in the action; and in *Zielasko, supra,* at 958, a registered voter supporting the candidacy of Zielasko joined the action challenging the constitutional validity of age requirements to any judicial office under the First Amendment and the Equal Protection Clause.

■ Assuming that appellants, indeed, have standing to raise claims that voters' rights have been infringed, we find no basis to substantiate their assertion of injury. The fundamental right of voting, speech, and association does not grant voters an absolute right to vote for a specific individual, regardless of whether that candidate meets reasonable eligibility requirements. *Clements v. Fashing,* 457 U.S. at 967, 102 S.Ct. at 2845, *Zielasko v. State of Ohio,* at 961.

Furthermore, the anti-nepotism provisions in these statutes neither favor or disfavor particular viewpoints or political parties. Voting for candidates for the school board is only limited by excluding those persons who fall within the parameters of the challenged statutes. While the opportunity of voters to select particular candidates may be obstructed by these statutes, surely most candidates are not precluded from the voters' consideration. No substantial segment of the community is therefore barred from the ballot by these provisions. *See Wellford v. Battaglia,* 343 F.Supp. 143 (D.Del.1972), *aff'd,* 485 F.2d 1151 (3d Cir.1973). Neither do the challenged statutes inhibit the free exchange of ideas. *See Anderson v. Celebreeze, supra,* 460 U.S. at 792, 103 S.Ct. at 1572; *see also*

L. Tribe, *American Constitutional Law*, 13–20, p. 1109 (2d ed. 1988). The instant case therefore does not involve any significant injury to voters' First Amendment rights.

## C. STATE JUSTIFICATION FOR THE BURDEN

■ The second factor we must consider under *Anderson, supra,* is the state interest served by the anti-nepotism statutes. These provisions serve the Commonwealth's interest by ensuring that the system of common schools is as devoid as possible of the taint of nepotism. The General Assembly was under a constitutional mandate to establish an "efficient" public school system pursuant to our decision in *Rose v. Council for Better Education, Inc., supra.* In that opinion, we noted that minimal characteristics of an "efficient" school system, are that schools be operated with "no waste, no duplication, no mismanagement, and *no political influence.*" *Id.* at 213. (Emphasis added.) Said another way, the General Assembly had discretion in determining a way to devise a system that would serve to ensure impartial administration of our schools.

Removing nepotism is a legitimate state interest. This Court in *Rose, supra; Hall v. Boyd County Board of Education,* 265 Ky. 500, 97 S.W.2d 38 (1936); and *Letcher v. Commonwealth,* Ky., 414 S.W.2d 402 (1967), recognized the importance of such legislative action.

## D. APPLICATION OF BALANCING TEST

■ Application of the *Anderson* balancing test establishes that the anti-nepotism statutes impose only incidental burdens on appellants and voters. The statutory obstacles posed to appellant board members who are seeking re-election are impermanent. Thus, any perceived burden to them as candidates is de minimus, particularly since the status of candidacy does not preclude reasonable qualification requirements. *Storer v. Brown, supra.* Likewise, voters' rights to associate and to cast

their votes effectively are burdened, if at all, minimally.

Appellants argue that unlike the temporary bar from candidacy found in resign-to-run statutes, as we interpreted in *Yonts v. Commonwealth,* Ky., 700 S.W.2d 407 (1985), the challenged statutes permanently foreclose their future access to the ballot as candidates to serve on the school board. As we have just observed, the statutes in question provide minimal and impermanent bars to the appellants' candidacy for the school board. Therefore, under the *Anderson* balancing test, we find no substantial infringement of appellants' or voters' First Amendment rights, necessitating our invalidating the challenged statutes.

## III. EQUAL PROTECTION

Appellants, under the Equal Protection Clause of the Fourteenth Amendment, assert that KRS 160.180 denies their due process rights by creating an invidious discriminatory bar to their candidacy, and by inhibiting their right to political expression under the First Amendment. Under Equal Protection Clause analysis, appellants further argue that KRS 160.180(2)(i), is overinclusive and underinclusive, and that application of the provision's "grandfather clause" makes an irrational distinction between those board members covered by its exemption, and those who are not.

The Fourteenth Amendment provides in part:

no state shall ... deny to any person within its jurisdiction the equal protection of the laws, U.S. Constitution, amend. 14.

## A. LEVEL OF SCRUTINY

■ Our General Assembly, under the Equal Protection Clause, has great latitude to enact legislation that may appear to affect similarly situated people differently. *Clements v. Fashing,* 457 U.S. at 963, 102 S.Ct. at 2843. Legislative distinctions between persons, under traditional equal protection analysis, must bear a rational relationship to a legitimate state end. *Id.; Chapman v. Eastern Coal Corp.,* Ky., 519 S.W.2d 390 (1975). Under this test, statu-

torily created classifications will be held invalid when these classifications are totally unrelated to the state's purpose in their enactment, and when there is no other conceivable purpose for their continued viability. *Clements v. Fashing, supra, Id.*, citing *McDonald v. Board of Election Comm'rs.*, 394 U.S. 802, 808–809, 89 S.Ct. 1404, 1408–1409, 22 L.Ed.2d 739 (1969); *Kentucky Association of Chiropractors, Inc. v. Jefferson County Medical Society*, Ky., 549 S.W.2d 817 (1977).

■ A higher level of scrutiny must be applied under the Equal Protection Clause, when challenged statutes burden "suspect classes" of persons or what is deemed a constitutional "fundamental right." *Id.*, citing *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

■ KRS 160.180(2)(i) does not inflict injury to appellants' right to candidacy, because no such constitutional status exists. *Bullock v. Carter, supra.* Neither does the challenged statute affect a suspect class. *See Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). Traditionally, under circumstances such as the instant case, where no fundamental right or suspect class is involved, courts apply the rational basis test to determine whether a statute infringes Equal Protection Clause principles. Since appellants allege that First Amendment rights of candidacy and voters' rights are enmeshed with equal protection violations when KRS 160.180(2)(i) is applied, a question arises whether we should use the rational basis test or the *Anderson* balancing test. We apply the rational basis test, after determining under First Amendment analysis that no rights to candidacy exist, and that voters' rights of association and expression are not even peripherally curtailed by the challenged statutes.

## B. APPLICATION OF THE RATIONAL BASIS TEST

■ The purpose of this provision as we discussed in applying the *Anderson* balancing test under First Amendment analy-sis, is to "stamp-out" nepotism, a clear mandate from our opinion in *Rose, supra,* and the obvious intent of the General Assembly in earlier statutes enacted prior to KERA. *See Hall v. Boyd County Board of Education, supra; Letcher v. Commonwealth, supra,* Ky., 414 S.W.2d 402.

KRS 160.180(2)(i) directly addresses the appearance of nepotism by prohibiting persons from serving on a school board who have "relatives" employed in that school district. Such prohibitions have consistently been upheld under the rational basis test of Equal Protection Clause analysis. 63A Am.Jur.2d § 102; 11 ALR 4th *Nepotism in Public Service,* § 5[a]. In these cases, courts have determined that the challenged statutes remove the threat of nepotism from public employment, an "irritant to taxpayers, [that] can create conflicts of interest and adversely affect the morale of other employees in the school system." *See Whateley v. Leonia Board of Education,* 141 N.J.Super. 476, 358 A.2d 826, 828 (1976); *See also Keckeisen v. Independent School District 612,* 509 F.2d 1062, 1066 (8th Cir.1975), *cert. denied,* 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975). Such statutes, one court has reasoned, reflect "the state's interest in providing its children with a meaningful education, [an interest that] is fully and directly served by preventing conflicts in the administration of the educational system." *Hamilton v. Board of Trustees of Oconee School District,* 282 S.C. 519, 319 S.E.2d 717, 720 (Ct.App.1984).

KRS 160.180(2)(i) serves to aid in the avoidance of conflicts of interest and favoritism in the context of hiring employees for the school districts. The structure of KRS 160.180(2)(i), thus bears a rational relationship to eliminating nepotism, and therefore passes constitutional muster." *See Parsons v. County Del Norte,* 728 F.2d 1234, 1237 (9th Cir.1984), *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984).

### 1. UNDERINCLUSIVENESS

Appellants assert that KRS 160.180(2)(i) is underinclusive because it does not apply to board members serving on July 13, 1990,

whose relatives were not initially hired while they were in office. Appellants argue that KRS 160.180(2)(i) leaves open an entire class of relative-employees who are just as open to conflicts of interest and favoritism as those covered by the statute.

The Fourteenth Amendment allows legislatures wide leeway to enact laws that appear to affect similarly situated people differently. *McDonald v. Board of Election Comm'rs., supra,* 394 U.S. at 807, 89 S.Ct. at 1408. It is clear that relatives hired before board members were elected, will pose much less suspicion of favoritism, and thus they will be much less likely to affect the morale of their co-workers, an implicit intent of anti-nepotism statutes.

The statutory classification that KRS 160.180(2)(i) creates between board members with relatives hired during their tenure in office, and board members with relatives not hired during their tenure in office, thus has a reasonable basis, and therefore is not violative of equal protection principles. *Estridge v. Stovall,* Ky.App., 704 S.W.2d 653 (1985).

### 2. GRANDFATHER CLAUSE

Appellants claim that the trial court erroneously characterized the exemption in KRS 160.180(2)(i), as a "grandfather clause," because the exemption is not predicated on years of service, merit, or the effective date of the statute. Acknowledging that "grandfather exemptions" are granted extreme deference by the courts in social and economic legislation, appellants distinguish the challenged statute, arguing that it imposes a significant burden on appellants' candidacy.

The exemption found in KRS 160.180(2)(i) is not incorrectly characterized by the trial court as a grandfather clause. We have already noted that reasonable restrictions on candidacy are valid under the First and Fourteenth Amendment. Because the exemption classifies persons as either qualified or unqualified to be candidates for the school board, depending on the date when their relatives were employed by the same school district, we must ask what purposes the exemption serves, and whether those

purposes are legitimate. *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Kentucky Association of Chiropractors, Inc. v. Jefferson County Medical Society, supra.*

It is clear that the purpose of the grandfather provision is to prevent undue disruption of the school boards. In situations such as this, where relatives of board members were hired before the board members were elected to their posts, and before enactment of KERA, there is hardly any likelihood that favoritism was involved. Thus the intent behind the entire provision, to eliminate nepotism, is not activated.

The exemption rationally promotes continuity within the school system. Since the grandfather clause is narrowly tailored to fit this interest, it passes muster under the rationality test of the Equal Protection Clause. *Estridge v. Stovall, supra.*

### III. OVERBREADTH

 Appellants make three overbreadth challenges to KRS 160.180(1), (2)(i): (1) that the statutes in question infringe upon their, and their supporters' First Amendment rights of expression and association, and therefore are facially overbroad; (2) persons are disqualified from serving on the school board, who would not be engaged in improper nepotism, even though they have relatives employed by their school district; and (3) the challenged provisions are not narrowly tailored to serve the Commonwealth's interest of eliminating nepotism because administrative procedures enacted in KERA, remove decisional responsibility for hiring, transfers, promotions, or dismissals from the school board to the superintendent.

 Facial overbreadth challenges require that a constitutional right must be at a real, substantial, and basic risk. *Commonwealth v. Foley,* Ky., 798 S.W.2d 947 (1990). Associational and expressive rights are not in jeopardy because KRS 160.-180(2)(i), is not a censorial statute directed at particular groups or viewpoints; rather the provision is content neutral. *See Keyishian v. Board of Regents,* 385 U.S. 589,

87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Neither are appellants' rights to candidacy infringed, because no such fundamental protection is recognized. *Bullock v. Carter, supra.* The challenged statute prohibits appellants who are board members from being eligible for a simple office. We determined earlier, applying both the *Anderson* balancing test, and the rational basis test, that KRS 160.180(2)(i), did not unconstitutionally infringe on appellant school board members, and their supporters', First and Fourteenth Amendment rights; thus KRS 160.180 cannot be held facially overbroad.

Appellants assert that the statute is overbroad because it prevents school board members who would not engage in improper nepotism from seeking office. Overbreadth challenges to a statute essentially claim that in attempting to control "impermissible conduct, the statute also prohibits conduct which is constitutionally permissible." *Commonwealth v. Ashcraft*, Ky. App., 691 S.W.2d 229, 232 (1985), citing *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

We agree with the trial court that appellants' argument has been specifically rejected by the U.S. Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 29, 96 S.Ct. 612, 640, 46 L.Ed.2d 659 (1976). The appellants in *Buckley v. Valeo, supra,* challenged the validity of federal provisions setting campaign limits, arguing that they were overbroad because most contributors did not seek improper influence over a candidate's position or an officeholder's actions. *Id.* The Court held that Congress' interest in "safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." *Id.* Similarly, the virtual bar of KRS 160.180(2)(i), against nepotism, was deemed necessary by the General Assembly, to eliminate both the existence, and the appearance, of nepotism.

The General Assembly, as we have previously noted, under our decision in *Rose, supra,* and under § 183 of the Kentucky Constitution, was mandated to create a system of common schools throughout the state that is "efficient." In enacting KERA, the General Assembly, using its discretion, determined that even though direct responsibility for personnel decisions was placed with the superintendent in the revised statutes, this alone was not sufficient to ensure eliminating elements of favoritism and nepotism.

The means chosen by the General Assembly to erase both the fact, and the appearance, of nepotism are narrowly drawn. While KRS 160.180(3) subjects a board member to removal from office "if he attempts to influence the hiring of any school employee," a board member may exercise indirect influence concerning personnel matters since the Board still retains the power to appoint the superintendent, and it is the superintendent, under the new provisions in KERA, who is responsible for hiring, transferring, dismissing, assigning, promoting, and demoting school employees.

The General Assembly had discretion to determine that KRS 160.180(3) was a partial measure, and that a bar against board member-relative relationships was necessary to ensure maintenance of an "efficient" school system. *See Buckley v. Valeo*, 424 U.S. at 29, 96 S.Ct. at 639. Thus appellants' overbreadth challenge of KRS 160.180(2)(i), asserting that removal provisions in the statutes provide less drastic, and less restrictive means, to address incidents of nepotism in hiring school personnel, also fails. *See Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

## IV. EMPLOYEE CHALLENGE OF KRS 160.380(2)(f)

KRS 160.380(2)(f) prohibits the superintendent from employing a relative of a school board member of the same district. KRS 160.380(2)(f) contains two exceptions: 1) school employees employed during a board member's tenure may continue to serve the remainder of the board member's term; and 2) school employees retained prior to their relative taking office

to serve on the school board, may continue in their position.

KRS 160.380(2)(f) is the flip-image of KRS 160.180(2)(i). When both provisions are read together, as the trial court noted, "there is a clear understanding of the prohibition against nepotism."

Employee appellant, V. Carolyn Chapman, challenges the validity of KRS 160.-380(2)(f), asserting that: 1) all the challenged provisions, including KRS 160.-380(2)(f), are animated by an unconstitutional purpose of banishing board members having relatives employed by their school district, and therefore should be invalidated; 2) procedural due process is denied because employment is terminated without an appropriate hearing; 3) substantive due process is denied because, a) appellant's property interest in employment is arbitrarily and irrationally denied; and b) familial relationships implicating privacy interests are denied; and 4) equal protection is denied because the provision is overinclusive since all school employees with relatives on the school board are not beneficiaries of "illicit favoritism."

Total invalidation of the challenged provisions because they are animated by an unconstitutional purpose is a meritless claim. No improper purpose is infused in these statutes which necessitates our striking them under *Kentucky Milk Marketing v. Kroger Co.*, Ky., 691 S.W.2d 893 (1985). In *Kentucky Milk Marketing, supra,* we held that provisions of a milk marketing law were not severable because the entire purpose of the act was enforcement of an unconstitutional section. Unlike *Kentucky Milk Marketing, supra,* the case at bar contains no unconstitutional provisions. Therefore, the question of severability is unwarranted.

No procedural or substantive due process is denied, because when both KRS 160.-180(2)(i), and KRS 160.380(2)(f), are applied, the result, as the trial court held, is that a school board member is disqualified from serving an additional term, as long as his relative is employed by the school district. Under both sections, related school board members and employees, serving or em-

ployed on the statute's effective date, may continue until expiration of the board member's term. The fact that a related school board member is disqualified from serving an additional term, under KRS 160.180(2)(i), thus does not deprive appellant, V. Carolyn Chapman, of her present employment.

Appellant's reliance on *Backman v. Bateman*, 1 Utah 2d 153, 263 P.2d 561 (1953), is misplaced. Unlike the case at bar, *Backman v. Bateman, supra,* reviewed the constitutionality of an anti-nepotism statute that prohibited continued employment of a relative who was hired before the school board member was elected. Exemptions in both challenged provisions protect against the scenario invalidated in *Backman v. Bateman, supra.*

Constitutional privacy protections of familial relationships are likewise not impinged, because KRS 160.380(2)(f) does not remove appellant from her position. Similarly, the provision is not invalid as overinclusive, nor does it provide for arbitrary classifications under appellant's equal protection claims.

## CONCLUSION

We uphold the constitutionality of KRS 160.180(2)(i) and KRS 160.380(2)(f), for the reasons previously set forth, and therefore affirm the trial court's grant of summary judgment in favor of the appellees.

COMBS, LEIBSON, REYNOLDS and SPAIN, JJ., concur.

LAMBERT, J., dissents in a separate dissenting opinion in which Special Justice L.T. PENISTON joins.

LAMBERT, Justice, dissenting.

I dissent upon the view that the majority has abridged the basic constitutional rights of citizens to vote, speak and associate for the advancement of their political beliefs. While the majority has attempted to diminish the implications of the effect of the statute at issue, it is indisputable that appellants, Virginia Chapman and Ron Peace, are prohibited from seeking re-election and serving upon a school board of which they are long-time members. It is not an an-

swer to say that "if their relatives transfer to work in another school district or change jobs entirely, appellants will no longer be foreclosed from seeking re-election to their posts."

In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the constitutional challenge was to an Ohio statute which required independent candidates for President to file a nominating petition with the requisite number of signatures on or before March 20 of the election year. To reach its decision, the Court reviewed certain basic principles of constitutional law which are applicable here. It was reiterated that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Id.,* 460 U.S. at 786, 103 S.Ct. at 1568. Citing *NAACP v. Alabama, ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty assured by the Due Process Clause of the Fourteenth Amendment which embraces freedom of speech ...," the Court in *Anderson* held that the voters' fundamental right of political association under the First Amendment and their Fourteenth Amendment liberty interest was directly affected by limitations on the rights of candidates for public office. The Court acknowledged the necessity for reasonable, non-discriminatory restrictions to promote legitimate state interests such as electoral integrity and substantial electoral support, but held such restrictions to an exacting standard of justification.

The justification advanced here is in a phrase "prevention of nepotism." Much is made in *Rose v. Council for Better Education, Inc.,* Ky., 790 S.W.2d 186 (1989), of the practice of nepotism and favoritism in the operation of Kentucky's public schools. However, with enactment of the KERA, a virtual battery of statutes was enacted to combat this evil. As shown in the majority opinion, school board members must now take an oath that they will not in any way influence the hiring or appointment of school district employees. Violation of the oath is grounds for removing the offending board member from office. Board members are prohibited from trading influence and from basing personnel decisions on race, sex, age and other matters improper for consideration. Board members no longer have the unrestricted power to hire and fire superintendents as approval by the chief state school officer is required. Finally, the superintendent, not the school board, is charged with "the general conduct of the schools" and "for the hiring and dismissal of all personnel in the district."

*Anderson v. Celebrezze, supra,* sets forth the analytical process by which challenges to state election laws must be measured. First, it directs consideration of the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. Here, the injury is manifest. Voters are absolutely denied an opportunity to vote for an otherwise qualified candidate based solely on the candidate's kinship to a school district employee. The political debate such a candidate would promote is lost to the electorate. In addition, denial of voters' rights to associate and support the candidate reduces the diversity of choice and runs contrary to the "principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

Finally, *Anderson v. Celebrezze, supra,* suggests that reviewing courts weigh the competing interests to determine whether the challenged statute may survive. While nepotism has been declared to be an impediment to efficient public education, the remedy need not be so drastic as prohibition of the candidacy. The improper conduct has been proscribed and additional less intrusive remedies, if desired, could be fashioned to prevent the practice denounced. It is simply unnecessary to prohibit candidacy, particularly when the political rights of the entire electorate are infringed, in order to alleviate nepotism.

Even when pursuing a legitimate state interest, the state may not choose a means which unnecessarily restricts constitution-

ally protected liberty. When constitutionally protected rights are infringed, the regulations must be precise (*Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)), and the state must employ the least restrictive means of satisfying its interest. When measured against the foregoing principles, the statute contested here must fail.

Special Justice L.T. PENISTON joins in this dissenting opinion.